# DOLE FOOD CO. ET AL. *v.* PATRICKSON ET AL.

No. 01–593.   Argued January 22, 2003—Decided April 22, 2003*

---

*Together with No. 01–594, *Dead Sea Bromine Co., Ltd., et al.* v. *Patrickson et al.*, also on certiorari to the same court.

470

KENNEDY, J., delivered the opinion for a unanimous Court with respect to Parts I, II–A, and II–C, and the opinion of the Court with respect to Part II–B, in which REHNQUIST, C. J., and STEVENS, SCALIA, SOUTER, THOMAS, and GINSBURG, JJ., joined. BREYER, J., filed an opinion concurring in part and dissenting in part, in which O'CONNOR, J., joined, *post*, p. 480.

*Peter R. Paden* argued the cause for petitioners in both cases. With him on the briefs in No. 01–594 were *Philip E. Karmel, Laurence A. Horvath, Thomas C. Walsh,* and *James F. Bennett.* On the briefs in No. 01–593 were *Robert H. Klonoff, Daniel H. Bromberg, Terence M. Murphy, Michael L. Rice, Robert G. Crow, Richard C. Sutton, Jr., Robert T. Greig, Boaz S. Morag, Michael L. Brem, F. Walter Conrad, Jr., D. Ferguson McNiel III, Charles W. Schwartz,* and *R. Burton Ballanfant.*

*Jonathan S. Massey* argued the cause for respondents in both cases. With him on the brief was *Christian H. Hartley.*

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Kneedler, Douglas N. Letter, H. Thomas Byron III,* and *William Howard Taft IV.*[†]

JUSTICE KENNEDY delivered the opinion of the Court.

Foreign states may invoke certain rights and immunities in litigation under the Foreign Sovereign Immunities Act of

[†]Briefs of *amici curiae* urging reversal were filed for the Republic of Ireland et al. by *Martin R. Baach* and *James P. Davenport;* and for Consortium de Réalisation et al. by *George J. Terwilliger III, Darryl S. Lew,* and *R. Shawn Gunnarson.*

1976 (FSIA or Act), Pub. L. 94–583, 90 Stat. 2891. Some of the Act's provisions also may be invoked by a corporate entity that is an "instrumentality" of a foreign state as defined by the Act. *Republic of Argentina* v. *Weltover, Inc.,* 504 U. S. 607, 611 (1992); *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 488 (1983). The corporate entities in this action claim instrumentality status to invoke the Act's provisions allowing removal of state-court actions to federal court. As the action comes to us, it presents two questions. The first is whether a corporate subsidiary can claim instrumentality status where the foreign state does not own a majority of its shares but does own a majority of the shares of a corporate parent one or more tiers above the subsidiary. The second question is whether a corporation's instrumentality status is defined as of the time an alleged tort or other actionable wrong occurred or, on the other hand, at the time suit is filed. We granted certiorari, 536 U. S. 956 (2002).

I

The underlying action was filed in a state court in Hawaii in 1997 against Dole Food Company and other companies (Dole petitioners). Plaintiffs in the action were a group of farm workers from Costa Rica, Ecuador, Guatemala, and Panama who alleged injury from exposure to dibromochloropropane, a chemical used as an agricultural pesticide in their home countries. The Dole petitioners impleaded petitioners Dead Sea Bromine Co., Ltd., and Bromine Compounds, Ltd. (collectively, the Dead Sea Companies). The merits of the suit are not before us.

The Dole petitioners removed the action to the United States District Court for the District of Hawaii under 28 U. S. C. § 1441(a), arguing that the federal common law of foreign relations provided federal-question jurisdiction under § 1331. The District Court agreed there was federal subject-matter jurisdiction under the federal common law of

foreign relations but, nevertheless, dismissed the case on grounds of *forum non conveniens.*

The Dead Sea Companies removed under a separate theory. They claimed to be instrumentalities of a foreign state as defined by the FSIA, entitling them to removal under § 1441(d). The District Court held that the Dead Sea Companies are not instrumentalities of a foreign state for purposes of the FSIA and are not entitled to removal on that basis. Civ. No. 97–01516HG (D. Haw., Sept. 9, 1998), App. to Pet. for Cert. in No. 01–594, p. 79a.

The Court of Appeals reversed. Addressing the ground relied on by the Dole petitioners, it held removal could not rest on the federal common law of foreign relations. 251 F. 3d 795, 800 (CA9 2001). In this Court the Dole petitioners did not seek review of that portion of the Court of Appeals' ruling, and we do not address it. Accordingly, the writ of certiorari in No. 01–593 is dismissed.

The Court of Appeals also reversed the order allowing removal at the instance of the Dead Sea Companies, who alleged they were instrumentalities of the State of Israel. The Court of Appeals noted, but declined to answer, the question whether status as an instrumentality of a foreign state is assessed at the time of the alleged wrongdoing or at the time suit is filed. It went on to hold that the Dead Sea Companies, even at the earlier date, were not instrumentalities of Israel because they did not meet the Act's definition of instrumentality.

In order to prevail here, the Dead Sea Companies must show both that instrumentality status is determined as of the time the alleged tort occurred and that they can claim instrumentality status even though they were but subsidiaries of a parent owned by the State of Israel. We address each question in turn. In No. 01–594, the case in which the Dead Sea Companies are petitioners, we now affirm.

## II

### A

Title 28 U. S. C. § 1441(d) governs removal of actions against foreign states. It provides that "[a]ny civil action brought in a State court against a foreign state as defined in [28 U. S. C. § 1603(a)] may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending." See also § 1330 (governing original jurisdiction). Section 1603(a), part of the FSIA, defines "foreign state" to include an "agency or instrumentality of a foreign state." "[A]gency or instrumentality of a foreign state" is defined, in turn, as:

"[A]ny entity—

"(1) which is a separate legal person, corporate or otherwise, and

"(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

"(3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country." § 1603(b).

### B

The Court of Appeals resolved the question of the FSIA's applicability by holding that a subsidiary of an instrumentality is not itself entitled to instrumentality status. Its holding was correct.

The State of Israel did not have direct ownership of shares in either of the Dead Sea Companies at any time pertinent to this suit. Rather, these companies were, at various times, separated from the State of Israel by one or more intermediate corporate tiers. For example, from 1984–1985, Israel wholly owned a company called Israeli Chemicals, Ltd.; which owned a majority of shares in another company called

Dead Sea Works, Ltd.; which owned a majority of shares in Dead Sea Bromine Co., Ltd.; which owned a majority of shares in Bromine Compounds, Ltd.

The Dead Sea Companies, as indirect subsidiaries of the State of Israel, were not instrumentalities of Israel under the FSIA at any time. Those companies cannot come within the statutory language which grants status as an instrumentality of a foreign state to an entity a "majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." § 1603(b)(2). We hold that only direct ownership of a majority of shares by the foreign state satisfies the statutory requirement.

Section 1603(b)(2) speaks of ownership. The Dead Sea Companies urge us to ignore corporate formalities and use the colloquial sense of that term. They ask whether, in common parlance, Israel would be said to own the Dead Sea Companies. We reject this analysis. In issues of corporate law structure often matters. It is evident from the Act's text that Congress was aware of settled principles of corporate law and legislated within that context. The language of § 1603(b)(2) refers to ownership of "shares," showing that Congress intended statutory coverage to turn on formal corporate ownership. Likewise, § 1603(b)(1), another component of the definition of instrumentality, refers to a "separate legal person, corporate or otherwise." In light of these indicia that Congress had corporate formalities in mind, we assess whether Israel owned shares in the Dead Sea Companies as a matter of corporate law, irrespective of whether Israel could be said to have owned the Dead Sea Companies in everyday parlance.

A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. See, *e. g.,* *First Nat. City Bank* v. *Banco Para el Comercio Exterior de Cuba,* 462 U. S. 611, 625 (1983) ("Separate legal personality has been described as 'an almost indispensable aspect of the public corporation'"); *Burnet* v. *Clark,* 287 U. S. 410, 415

(1932) ("A corporation and its stockholders are generally to be treated as separate entities"). An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets and, as a result, does not own subsidiary corporations in which the corporation holds an interest. See 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 31 (rev. ed. 1999). A corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary; and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary. See *id.*, § 31, at 514 ("The properties of two corporations are distinct, though the same shareholders own or control both. A holding corporation does not own the subsidiary's property"). The fact that the shareholder is a foreign state does not change the analysis. See *First Nat. City Bank, supra,* at 626–627 ("[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such").

Applying these principles, it follows that Israel did not own a majority of shares in the Dead Sea Companies. The State of Israel owned a majority of shares, at various times, in companies one or more corporate tiers above the Dead Sea Companies, but at no time did Israel own a majority of shares in the Dead Sea Companies. Those companies were subsidiaries of other corporations.

The veil separating corporations and their shareholders may be pierced in some circumstances, and the Dead Sea Companies essentially urge us to interpret the FSIA as piercing the veil in all cases. The doctrine of piercing the corporate veil, however, is the rare exception, applied in the case of fraud or certain other exceptional circumstances, see, *e. g., Burnet, supra,* at 415; Fletcher, *supra,* §§ 41 to 41.20, and usually determined on a case-by-case basis. The Dead Sea Companies have referred us to no authority for extending the doctrine so far that, as a categorical matter, all subsidiar-

ies are deemed to be the same as the parent corporation. The text of the FSIA gives no indication that Congress intended us to depart from the general rules regarding corporate formalities.

Where Congress intends to refer to ownership in other than the formal sense, it knows how to do so. Various federal statutes refer to "direct and indirect ownership." See, e. g., 5 U. S. C. § 8477(a)(4)(G)(iii) (referring to an interest "owned directly or indirectly"); 12 U. S. C. § 84(c)(5) (referring to "any corporation wholly owned directly or indirectly by the United States"); 15 U. S. C. § 79b(a)(8)(A) (referring to securities "which are directly or indirectly owned, controlled, or held with power to vote"); § 1802(3) ("The term 'newspaper owner' means any person who owns or controls directly, or indirectly through separate or subsidiary corporations, one or more newspaper publications"). The absence of this language in 28 U. S. C. § 1603(b) instructs us that Congress did not intend to disregard structural ownership rules.

The FSIA's definition of instrumentality refers to a foreign state's majority ownership of "shares or other ownership interest." § 1603(b)(2). The Dead Sea Companies would have us read "other ownership interest" to include a state's "interest" in its instrumentality's subsidiary. The better reading of the text, in our view, does not support this argument. The words "other ownership interest," when following the word "shares," should be interpreted to refer to a type of interest other than ownership of stock. The statute had to be written for the contingency of ownership forms in other countries, or even in this country, that depart from conventional corporate structures. The statutory phrase "other ownership interest" is best understood to accomplish this objective. Reading the term to refer to a state's interest in entities lower on the corporate ladder would make the specific reference to "shares" redundant. Absent a statutory text or structure that requires us to depart from normal rules of construction, we should not construe the statute in

a manner that is strained and, at the same time, would render a statutory term superfluous. See *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 258 (1993) ("We will not read the statute to render the modifier superfluous"); *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 36 (1992) (declining to adopt a construction that would violate the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect").

The Dead Sea Companies say that the State of Israel exercised considerable control over their operations, notwithstanding Israel's indirect relationship to those companies. They appear to think that, in determining instrumentality status under the Act, control may be substituted for an ownership interest. Control and ownership, however, are distinct concepts. See, *e. g., United States* v. *Bestfoods*, 524 U. S. 51, 64–65 (1998) (distinguishing between "operation" and "ownership" of a subsidiary's assets for purposes of Comprehensive Environmental Response, Compensation, and Liability Act of 1980 liability). The terms of § 1603(b)(2) are explicit and straightforward. Majority ownership by a foreign state, not control, is the benchmark of instrumentality status. We need not delve into Israeli law or examine the extent of Israel's involvement in the Dead Sea Companies' operations. Even if Israel exerted the control the Dead Sea Companies describe, that would not give Israel a "majority of [the companies'] shares or other ownership interest." The statutory language will not support a control test that mandates inquiry in every case into the past details of a foreign nation's relation to a corporate entity in which it does not own a majority of the shares.

The better rule is the one supported by the statutory text and elementary principles of corporate law. A corporation is an instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority of the corporation's shares.

We now turn to the second question before us, which provides an alternative reason for affirming the Court of Appeals. See *Woods* v. *Interstate Realty Co.,* 337 U. S. 535, 537 (1949).

## C

To be entitled to removal under § 1441(d), the Dead Sea Companies must show that they are entities "a majority of whose shares or other ownership interest is owned by a foreign state." § 1603(b)(2). We think the plain text of this provision, because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed.

Construing § 1603(b) so that the present tense has real significance is consistent with the "longstanding principle that 'the jurisdiction of the Court depends upon the state of things at the time of the action brought.'" *Keene Corp.* v. *United States,* 508 U. S. 200, 207 (1993) (quoting *Mollan* v. *Torrance,* 9 Wheat. 537, 539 (1824)). It is well settled, for example, that federal-diversity jurisdiction depends on the citizenship of the parties at the time suit is filed. See, *e. g., Anderson* v. *Watt,* 138 U. S. 694, 702–703 (1891) ("And the [jurisdictional] inquiry is determined by the condition of the parties at the commencement of the suit"); see also *Minneapolis & St. Louis R. Co.* v. *Peoria & Pekin Union R. Co.,* 270 U. S. 580, 586 (1926) ("The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought"). The Dead Sea Companies do not dispute that the time suit is filed is determinative under § 1332(a)(4), which provides for suits between "a foreign state, defined in section 1603(a) . . . , as plaintiff and citizens of a State or of different States." It would be anomalous to read § 1441(d)'s words, "foreign state as defined in section 1603(a)," differently.

The Dead Sea Companies urge us to administer the FSIA like other status-based immunities, such as the qualified immunity accorded a state actor, that are based on the status

of an officer at the time of the conduct giving rise to the suit. We think its comparison is inapt. Our cases applying those immunities do not involve the interpretation of a statute. See, *e. g., Spalding* v. *Vilas*, 161 U. S. 483, 493–499 (1896) (basing a decision regarding official immunity on common law and considerations of "convenience and public policy"); *Scheuer* v. *Rhodes*, 416 U. S. 232, 239–242 (1974).

The reason for the official immunities in those cases does not apply here. The immunities for government officers prevent the threat of suit from "crippl[ing] the proper and effective administration of public affairs." *Spalding, supra,* at 498 (discussing immunity for executive officers); see also *Pierson* v. *Ray*, 386 U. S. 547, 554 (1967) (judicial immunity serves the public interest in judges who are "at liberty to exercise their functions with independence and without fear of consequences" (internal quotation marks omitted)). Foreign sovereign immunity, by contrast, is not meant to avoid chilling foreign states or their instrumentalities in the conduct of their business but to give foreign states and their instrumentalities some protection from the inconvenience of suit as a gesture of comity between the United States and other sovereigns. *Verlinden,* 461 U. S., at 486.

For the same reason, the Dead Sea Companies' reliance on *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982), is unavailing. There, we recognized that the President was immune from liability for official actions taken during his time in office, even against a suit filed when he was no longer serving in that capacity. The immunity served the same function that the other official immunities serve. See *id.,* at 751 ("Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government"). As noted above, immunity under the FSIA does not serve the same purpose.

The immunity recognized in *Nixon* was also based on a further rationale, one not applicable here: the constitutional

separation of powers. See *id.,* at 749 ("We consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history"). That rationale is not implicated by the statutory immunity Congress created for actions such as the one before us.

Any relationship recognized under the FSIA between the Dead Sea Companies and Israel had been severed before suit was commenced. As a result, the Dead Sea Companies would not be entitled to instrumentality status even if their theory that instrumentality status could be conferred on a subsidiary were accepted.

\*     \*     \*

For these reasons, we hold first that a foreign state must itself own a majority of the shares of a corporation if the corporation is to be deemed an instrumentality of the state under the provisions of the FSIA; and we hold second that instrumentality status is determined at the time of the filing of the complaint.

The judgment of the Court of Appeals in No. 01–594 is affirmed, and the writ of certiorari in No. 01–593 is dismissed.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, concurring in part and dissenting in part.

I join Parts I, II–A, and II–C, and dissent only from Part II–B, of the Court's opinion. Unlike the majority, I believe that the statutory phrase "other ownership interest . . . owned by a foreign state," 28 U. S. C. § 1603(b)(2), covers a Foreign Nation's legal interest in a Corporate Subsidiary, where that interest consists of the Foreign Nation's ownership of a Corporate Parent that owns the shares of the Subsidiary.

The Foreign Sovereign Immunities Act of 1976 (FSIA) sets forth legal criteria for determining when a "foreign state," 28 U. S. C. § 1603(a), can assert a defense of sovereign immunity. The FSIA also specifies that a "foreign state" defendant may ask a federal court to make the relevant sovereign immunity determination. § 1441(d). And the FSIA allows certain foreign-state commercial entities *not entitled to sovereign immunity* to have the merits of a case heard in federal court. §§ 1330(a), 1441(d), 1605(a)(2). These last-mentioned entities, entitled to invoke federal-court jurisdiction, include corporations that fall within the FSIA's definition of an "agency or instrumentality of a foreign state," §§ 1603(a), (b).

The corporate defendants here, subsidiaries of a foreign parent corporation, fall within that definition if "a majority of [their] shares or *other ownership interest is owned by*" a foreign nation. § 1603(b)(2) (emphasis added). The relevant foreign nation does not *directly* own a majority of the corporate subsidiaries' shares. But (simplifying the facts) it does own a corporate parent, which, in turn, owns the corporate subsidiaries' shares. See *ante*, at 473–474.

Does this type of majority-ownership interest count as an example of what the statute calls an "other ownership interest"? The Court says no, holding that the text of the FSIA requires that *"only direct ownership* of a majority of shares by the foreign state satisfies the statutory requirement." *Ante*, at 474 (emphasis added). I disagree.

The statute's language, standing alone, cannot answer the question. That is because the words "own" and "ownership"—neither of which is defined in the FSIA—are not technical terms or terms of art but common terms, the precise legal meaning of which depends upon the statutory context in which they appear. See J. Cribbet & C. Johnson, Principles of the Law of Property 16 (3d ed. 1989) ("Anglo-American law has not made much use of the term ownership in a technical sense"); Black's Law Dictionary 1049, 1105 (6th

ed. 1990) ("The term ['owner'] is . . . a nomen generalissimum"—a "term of the most general meaning" or "of the most general kind"—"and its meaning is to be gathered from the connection in which it is used, and from the subject-matter to which it is applied"). See also *Williams* v. *Taylor*, 529 U. S. 420, 431 (2000) ("We give the words of a statute their *ordinary, contemporary, common meaning,* absent an indication Congress intended them to bear some different import" (internal quotation marks omitted; emphasis added)).

Thus, this Court has held that "ship*owne[r]*" can include a corporate shareholder even though, technically speaking, the corporation, not the shareholder, owns the ship. *Flink* v. *Paladini,* 279 U. S. 59, 62–63 (1929) (emphasis added). Moreover, this Court has held that a trademark can be *"owned by"* a parent corporation even though, technically speaking, a subsidiary corporation, not the parent, registered and thus owned the mark. *K mart Corp.* v. *Cartier, Inc.,* 486 U. S. 281, 292 (1988) (opinion of KENNEDY, J.) (emphasis added) (noting "the inability to discern" which "entit[y] . . . can be said to 'own' the . . . trademark if . . . the domestic subsidiary is wholly owned by its foreign parent"); *id.,* at 318 (SCALIA, J., concurring in part and dissenting in part) ("It may be reasonable for some purposes to say that a trademark nominally owned by a domestic subsidiary is 'owned by' its foreign parent corporation"); *id.,* at 319 ("A parent corporation may or may not be said to 'own' the assets owned by its subsidiary"). Similarly, here the words "other ownership interest" might, or might not, refer to the kind of majority-ownership interest that arises when one owns the shares of a parent that, in turn, owns a subsidiary. If a shareholder in Company A is an "owner" of Company A's ship, as in *Flink,* then why should the shareholder not be an "owner" of Company A's subsidiary? If Company A's trademark can be said to be "owned by" its shareholder, as in *K mart,* then why should Company A's subsidiary not be said

to be "owned by" its shareholder? And, at the very least, can we not say that the shareholder has an "ownership interest" in the subsidiary?

Neither do the various linguistic indicia to which the majority points help resolve the question. As the majority points out, the statute's use of the word "shares" leans in favor of reading "ownership" as incorporating formal, technical American legal requirements. *Ante*, at 474–475. But any resulting suggestion of formal technical limitation is neatly counterbalanced by the fact that the "statute had to be written for the contingency of ownership forms in other countries, or even in this country, that depart from conventional corporate structures." *Ante*, at 476. And given this latter necessity, there is no reason to read the phrase *"shares or other"* as if those words meant to exclude from the scope of "other" any kind of mixed, say, debt/equity, ownership arrangement that might involve shares only in part.

The majority's further claim that Congress' use of the word "ownership" means "only *direct* ownership," *ante*, at 474 (emphasis added), or formal ownership, founders upon *Flink, supra,* and *K mart, supra,* as well as upon several statutes that demonstrate that Congress felt it necessary explicitly to use the word "direct" (a word missing in the FSIA) in order to achieve that result. See, *e. g.,* 20 U. S. C. § 1087–3(a) ("common shares . . . *directly owned* by a Holding Company" (emphasis added)); 26 U. S. C. § 165(g)(3)(A) (requiring that "the taxpayer *owns directly* stock" in a corporation (emphasis added)); § 851(c)(3)(A) (stock *"owned directly* by one or more of the other corporations" (emphasis added)). Were the Court's logic correct, see *ante*, at 476–477, the word "direct" in these statutes would be redundant.

The majority's "veil piercing" argument, *ante*, at 475–476, is beside the point. So is the majority's reiteration of the separateness of a corporation and its shareholders, *ante*, at 474–475, a formal separateness that this statute explicitly sets aside. See 28 U. S. C. §§ 1603(a), (b) (acknowledging the

separateness of a corporate entity but nevertheless deliberately conferring the "foreign state" status of the shareholder upon the corporation itself); H. R. Rep. No. 94–1487, p. 15 (1976) (same). See also Working Group of the American Bar Association, Reforming the Foreign Sovereign Immunities Act, 40 Colum. J. Transnat'l L. 489, 517–518 (2002) (hereinafter ABA Working Group) (FSIA rejects the "separate-entity" rule that courts had often applied to deny immunity to state-owned corporations).

Statutory interpretation is not a game of blind man's bluff. Judges are free to consider statutory language in light of a statute's basic purposes. And here, as in *Flink, supra,* and *K mart, supra,* an examination of those purposes sheds considerable light. The statute itself makes clear that it seeks: (1) to provide a foreign-state defendant in a legal action the right to have its claim of a sovereign immunity bar decided by the "courts of the United States," *i. e.,* the federal courts, 28 U. S. C. § 1604; see § 1441(d); and (2) to make certain that the merits of unbarred claims against foreign states, say, states engaging in commercial activities, see § 1605(a)(2), will be decided "in the same manner" as similar claims against "a private individual," § 1606; but (3) to guarantee a foreign state defending an unbarred claim certain protections, including a prohibition of punitive damages, the right to removal to federal court, a trial before a judge, and other procedural rights (related to service of process, venue, attachment, and execution of judgments). §§ 1330, 1391(f), 1441(d), 1606, 1608–1611. See *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 497 (1983) ("Congress deliberately sought to channel cases against foreign sovereigns away from the state courts and into federal courts"); H. R. Rep. No. 94–1487, at 32 ("giv[ing] foreign states clear authority to remove to a Federal forum actions brought against them in the State courts" in light of "the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area"); *id.,* at 13 ("Such

broad jurisdiction in the Federal courts should be conducive
to uniformity in decision, which is desirable since a disparate
treatment of cases involving foreign governments may have
adverse foreign relations consequences").

Most important for present purposes, the statute seeks to
guarantee these protections to the foreign nation not only
when it acts directly in its own name but also when it acts
through separate legal entities, including corporations and
other "organ[s]." 28 U. S. C. § 1603(b).

Given these purposes, what might lead Congress to grant
protection to a Foreign Nation acting through a Corporate
Parent but deny the same protection to the Foreign Nation
acting through, for example, a wholly owned Corporate Sub-
sidiary? The answer to this question is: In terms of the
statute's purposes, *nothing at all* would lead Congress to
make such a distinction.

As far as this statute is concerned, decisions about how to
incorporate, how to structure corporate entities, or whether
to act through a single corporate layer or through several
corporate layers are matters purely of form, not of substance.
Cf. H. R. Rep. No. 94–1487, at 15 (agencies or instrumentali-
ties "could assume a variety of forms"); *First Nat. City Bank
v. Banco Para el Comercio Exterior de Cuba,* 462 U. S. 611,
625 (1983) (noting that "developing countries" often "estab-
lish separate juridical entities . . . to make large-scale na-
tional investments"). The need for federal-court determin-
ation of a sovereign immunity claim is no less important
where subsidiaries are involved. The need for procedural
protections is no less compelling. The risk of adverse for-
eign policy consequences is no less great. See ABA Work-
ing Group 523 ("The strength of a foreign state's sovereign
interests . . . does not necessarily dissipate when it employs
more complicated legal structures resembling those used by
modern private businesses"); Dellapenna, Refining the For-
eign Sovereign Immunities Act, 9 Willamette J. Int'l L. &
Disp. Resol. 57, 92–93 (2001). See also A. Kumar, The State

Holding Company: Issues and Options 3 (World Bank Discussion Paper No. 187, 1992) ("The existence of state holding companies, in many variants, is widespread").

That is why I doubt the majority's claim that its reading of the text of the FSIA is "[t]he better reading," *ante*, at 476, leading to "[t]he better rule," *ante*, at 477. The majority's rule is not better for a foreign nation, say, Mexico or Honduras, which may use "a tiered corporate structure to manage and control important areas of national interest, such as natural resources," ABA Working Group 523, and, as a result, will find its ability to use the federal courts to adjudicate matters of national importance and "potential sensitivity" restricted, H. R. Rep. No. 94–1487, at 32. Congress is most unlikely to characterize as "better" a rule tied to legal formalities that undercuts its basic jurisdictional objectives. And working lawyers will now have to factor into complex corporate restructuring equations (determining, say, whether to use an intermediate holding company when merging or disaggregating even wholly owned government corporations) a risk that the government might lose its previously available access to federal court.

Given these consequences, from what perspective can the Court's unnecessarily technical reading of this part of the statute produce a "better rule"? To hold, as the Court does today, that for purposes of the FSIA "other ownership interest" does not include the interest that a Foreign Nation has in a tiered Corporate Subsidiary "would be not merely to depart from the primary rule that words are to be taken in their ordinary sense, but to narrow the operation of the statute to an extent that would seriously imperil the accomplishment of its purpose." *Danciger* v. *Cooley*, 248 U. S. 319, 326 (1919).

I believe that the Court should decide this issue just as it decided *Flink*. There, the Court unanimously determined that, in light of "[t]he policy of the statutes" in question, a corporate shareholder was an "owner" of a ship, which, tech-

nically speaking, belonged to the corporation. 279 U. S., at 62–63. Justice Holmes wrote, in his opinion for the Court:

> "For th[e] purpose [of these statutes] no rational distinction can be taken between several persons owning shares in a vessel [here, a subsidiary] directly and making the same division by putting the title in a corporation and distributing the corporate stock. The policy of the statutes must extend equally to both. . . . We are of [the] opinion that the words of the acts must be taken in a broad and popular sense in order not to defeat the manifest intent. This is not to ignore the distinction between a corporation and its members, a distinction that cannot be overlooked even in extreme cases . . . , but to interpret an untechnical word ['owner'] in the liberal way in which we believe it to have been used . . . ." *Ibid.*

No more need be said.