# In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 06-1955 & 06-2357

LABORERS' PENSION FUND, *et al.*,

*Plaintiffs-Appellees,*

*v.*

PAVEMENT MAINTENANCE, INC., and
JOSEPH T. HAUGHEY,

*Defendants-Judgment Debtors,*

MAT LEASING, INC.,

*Respondent-Appellant,*

MB FINANCIAL BANK,

*Adverse Claimant-Appellee.*

———————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 5603—**James B. Zagel**, *Judge.*

———————————

ARGUED DECEMBER 4, 2007—DECIDED AUGUST 29, 2008

———————————

Before RIPPLE, MANION, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* MAT Leasing, Inc., challenges an
order entered by the district court during post-judgment

collection proceedings. Those proceedings stemmed from a money judgment against Pavement Maintenance, Inc. ("PMI"), on PMI's default, in favor of the three plaintiffs in the litigation: Laborers' Pension Fund, Laborers' Welfare Fund, and James S. Jorgenson, the Funds' Administrator. We refer to the plaintiffs as "the Funds"; collectively, they make up the first set of appellees before us. The other appellee, MB Financial Bank, entered the post-judgment proceedings in the district court as an adverse claimant. MB Financial has a perfected security interest in PMI's assets; its interest has priority over the Funds' interest in those assets.

But the appellees are not (at least now) pursuing PMI, which is not even a party to this appeal. Instead, they would like to collect from MAT Leasing, a third-party respondent in the district court and the appellant here. According to the Funds and MB Financial, MAT Leasing was indebted to PMI at the time judgment was entered against PMI. Following traditional principles of garnishment, the creditors to whom PMI owes money are attempting to collect that debt from MAT Leasing.

On March 8, 2006, the district court entered an order finding that MAT Leasing did owe money to PMI and, after incorporating a few offsets, it calculated the amount of debt at $242,647.75. On April 20, 2006, the court ordered MAT Leasing to turn over that amount to MB Financial, the adverse claimant and priority creditor. MAT Leasing has appealed judgments in favor of the Funds and of MB Financial; we affirm.

**I**

On April 18, 2001, MB Financial extended credit to PMI in the principal sum of $400,000. MB Financial filed the documents required to secure its interest and then, on August 1, 2001, properly perfected it by filing a UCC-1 financing statement. As we have noted, MB Financial's priority over the Funds' interest in PMI's assets is undisputed.

In the meantime, from 2000 to 2003, MAT Leasing was toiling away on a job it had obtained to perform repairs on certain Chicago streets by replacing asphalt. MAT Leasing removed the original asphalt and subcontracted to PMI the replacement paving work. PMI replaced the asphalt using its own equipment and crew of unionized laborers. PMI did not own any trucks, however, and so it purchased the trucking services required to pick up fresh asphalt from a supplier and transport it to the job site from a company called M.T. Transit. MAT Leasing and M.T. Transit were owned in part by Michael S. Tadin, Sr., and his son, Michael S. Tadin, Jr. At PMI's job sites, Joseph Haughey supervised PMI's work. Haughey was a partner in PMI and the primary contact person between PMI and its contractors, MAT Leasing and M.T. Transit.

While the repaving project was going on, PMI experienced myriad financial difficulties. Its records were a mess, its invoices were inaccurate, and it had trouble making payments to M.T. Transit for its trucking services. It failed to make timely payments on its loans from MB Financial or to make timely contributions to the Funds, which provided coverage to PMI's employees. Despite

these problems and its awareness of them, MAT Leasing continued to deal with PMI. Those dealings occurred primarily in the form of "handshake agreements" between MAT Leasing's head of operations, Mike Tadin, Jr., and Haughey, PMI's 50% owner and head of operations. When asked at an evidentiary hearing about these agreements, Tadin could not recall the details, but he affirmed that they were entirely verbal; no written documents exist to memorialize them.

On August 7, 2002, the Funds filed the complaint that started the present case. They began by suing PMI in the Northern District of Illinois for delinquent contributions and an audit. An amended complaint followed on July 10, 2003, adding PMI owner Haughey as a defendant. Four months later, on November 6, 2003, the district court entered a default judgment against PMI and Haughey and in favor of the Funds, in the amount of $59,975.47. Thereafter, the Funds initiated post-judgment proceedings pursuant to FED. R. CIV. P. 69(a), which instructs district courts to follow the law of supplementary proceedings of the state in which they sit. The parties and district court accordingly proceeded under the Illinois statute governing supplementary proceedings, 735 ILCS 5/2-1402.

The Funds sent citations to discover assets to several companies, seeking to find out if any of those third parties owed money to PMI—for if they did, Rule 69(a) and Illinois law would entitle the Funds to recover the amounts owed. With those citations still pending, MB Financial appeared in the district court on March 23, 2004, to assert its own

interest in PMI's assets. It claimed, and the Funds did not dispute, that it held a secured, perfected interest in PMI's assets with priority over that of the Funds. Two months later, on May 25, 2004, the district court entered an Agreed Order providing that (1) MB Financial's secured interest was perfected, valid, and enforceable, with first priority over PMI's assets; (2) the Funds' rights were valid and enforceable but subordinate to MB Financial's; and (3) the citations filed by the Funds, and any additional citations that third parties might file, would remain in full force and effect under Illinois Supreme Court Rule 277(f), "Supplementary Proceedings," and any recoveries obtained from those citations would apply first to the debt owed to MB Financial, and then to the debt due to the Funds.

Two weeks later, on June 2, 2004, attorneys for MB Financial wrote a letter to MAT Leasing, seeking to collect on accounts receivable that MB Financial believed were owed from MAT Leasing to PMI. (A letter also went to M.T. Transit, but because the matters relating to M.T. Transit are not pertinent to this appeal, we do not discuss them further.) The letter noted that "while [PMI's] records of invoices are complete, records of payments made to [PMI] are not, and therefore we are unsure of the actual balance outstanding." The letter requested copies of MAT Leasing's payments on these "outstanding accounts receivable," but MAT Leasing did not oblige. The following month, on July 7, 2004, the Funds issued a citation to discover assets to MAT Leasing; MAT Leasing did not respond to the citation nor did it comply, and so on October 13, 2004, the Funds filed a motion for rule to show

cause why the third-party citation respondent MAT Leasing and its President, Michael Tadin, should not be held in contempt for the failure to comply. The motion also asked the court to order the citation respondents to pay the attorneys' fees and costs that the Funds incurred in bringing the motion.

The district court granted the Funds' motion on January 11, 2005, and set a rule to show cause hearing for January 27, 2005. The hearing was conducted as a status hearing, and as it concluded, another status hearing was set for April 28, 2005. Counsel for MAT Leasing entered his appearance on April 15, 2005. Four days later, the Funds filed a motion for turnover of MAT Leasing's assets, along with a notice for presentment of that motion at the hearing scheduled for April 28. When that hearing convened, the district judge entered the Funds' motion for turnover of MAT Leasing's assets. Several additional postponements took place over the next few months, until on July 7 the court set an evidentiary hearing for September 7, 2005.

At the hearing, the parties focused on the question whether MAT Leasing owed money to PMI and, if so, how much. Two witnesses testified: Thomas Murray (President and the other 50% owner of PMI) and Michael Tadin, Jr. (head of operations for MAT Leasing). The district court took the issue under advisement, and on March 8, 2006, it granted the Funds' motion for turnover of MAT Leasing's assets and found that the amount of the debt was $242,647.75. MAT Leasing filed its notice of appeal from that order on April 5, 2006; this appeal was docketed as

No. 06-1955. Then on April 17, MB Financial moved in the district court for an order requiring MAT Leasing to pay the amount of money specified in the court's March 8 order. The court granted that motion three days later, on April 20. MAT Leasing filed a second notice of appeal from that decision; it was docketed as No. 06-2357; and we consolidated the two appeals for our review.

## II

MAT Leasing offers three reasons for reversing the district court's rulings. First, MAT Leasing argues that the district court "lost" its subject-matter jurisdiction over these post-judgment collection proceedings on June 13, 2005, because the Funds and MB Financial failed to comply with the requirements of Illinois Supreme Court Rule 277(f), which provides for "automatic termination" of collection proceedings after six months unless the trial court grants an extension. Second, assuming the district court was not divested of its subject-matter jurisdiction, MAT Leasing contends that the court erred in concluding that MAT Leasing owed any money to PMI. Lastly, MAT Leasing claims that even if it owed money to PMI, the district court clearly erred in its calculation of the amount. We address each argument in turn.

## A

We first consider MAT Leasing's argument that the district court lost its subject-matter jurisdiction in these post-judgment proceedings by operation of Illinois Supreme Court Rule 277(f), which provides:

> **(f) When Proceeding Terminated**. A proceeding under this rule continues until terminated by motion of the judgment creditor, order of the court, or satisfaction of the judgment, but *terminates automatically* 6 months from the date of (1) the respondent's first personal appearance pursuant to the citation or (2) the respondent's first personal appearance pursuant to subsequent process issued to enforce the citation, whichever is sooner. The court may, however, grant extensions beyond the 6 months, as justice may require. Orders for the payment of money continue in effect notwithstanding the termination of the proceedings until the judgment is satisfied or the court orders otherwise.

(Emphasis added.) MAT Leasing contends that this "automatic termination" provision is jurisdictional, and that the district court therefore lost its authority to hear the case when it allowed more than six months to elapse between Tadin's first appearance (on behalf of MAT Leasing) on December 13, 2004, and its ruling on March 8, 2006. Rule 277, in MAT Leasing's view, requires us to find that the district court's jurisdiction "expired" on June 13, 2005, six months after Tadin initially appeared. The Funds and MB Financial respond that Rule 277 is nothing more than a procedural mechanism by which post-judgment collection proceedings can terminate if they take too long and result in prejudice to or harassment of the judgment debtor. See *TM Ryan Co. v. 5350 S. Shore, LLC*, 836 N.E.2d 803, 810 (Ill. App. Ct. 2005).

MAT Leasing has no support for its strict jurisdictional theory. It has not shown us a single instance in which a

state rule of procedure has been permitted to divest a federal court of subject-matter jurisdiction, and there is certainly nothing in FED. R. CIV. P. 69(a) that would support such an outcome. See FED. R. CIV. P. 82 (rules "do not extend or limit the jurisdiction of the district courts"); 28 U.S.C. § 2072. The district court's subject-matter jurisdiction was based on the federal-question statute, 28 U.S.C. § 1331; the federal questions before the court arose under the Employee Retirement Income Security Act ("ERISA"), in particular the provisions that entitled the Funds to their contributions. See 29 U.S.C. §§ 1132(e)(1), 1145, and 185(a). The district court had ancillary jurisdiction over the post-judgment proceedings, and FED. R. CIV. P. 69(a) directed it to state law for the mechanics of the collection process. State rules of procedure cannot negate subject-matter jurisdiction arising from a federal statute and federal question.

Although we could stop there, we add that MAT Leasing's assertion that Rule 277(f) somehow caused the district court to lose its subject-matter jurisdiction ignores the well established principle that "jurisdiction is determined by the facts that exist when the suit is filed." *Olympia Express, Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 349 (7th Cir. 2007) (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2004)). As *Olympia Express* explained, "jurisdiction usually refers to a court's authority to entertain a case, rather than to procedural incidents." *Id.* at 350. If jurisdiction exists at the outset of a suit, subsequent procedural events will not divest the court of that original jurisdiction. See, *e.g.*, *Kanouse v. Martin*, 56 U.S. 198, 208 (1854*); Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 798-99 (7th Cir. 1980).

Further undermining MAT Leasing's position that
Rule 277(f) sets a jurisdictional, rather than procedural,
requirement is the way in which it has been applied by
Illinois and federal courts. Courts have adopted a flexible
approach to the rule. See *Levine v. Pascal*, 236 N.E.2d 425,
431 (Ill. App. Ct. 1968). Since the rule does not affect the
federal court's jurisdiction, its benefits could be forfeited
or waived. Here, MAT Leasing has at least forfeited any
complaint based on failure to comply with the rule,
because it failed to present this argument to the district
court. We might even find that MAT Leasing implicitly
waived the point entirely by continuing its active partic-
ipation in the district court proceedings long after the
asserted "expiration date" of June 13, 2005.

Even if we were inclined to overlook MAT Leasing's
forfeiture, it would still lose, because Illinois courts do not
apply Rule 277 in the rigid way MAT Leasing has advo-
cated. Illinois courts are unwilling to terminate proceed-
ings under this provision where the "extension[s] com-
plained of" were entered at the parties' agreement or at
the request of the party currently challenging the court's
authority, or where the extensions did not lead to harass-
ment of the complaining party. See, *e.g.*, *Nat'l Bank of
Albany Park v. Newberg*, 289 N.E.2d 197, 201 (Ill. App. Ct.
1972). It is significant that the expiration date that MAT
Leasing advocates occurred after MAT Leasing had itself
caused, requested, or agreed to multiple continuances
and delays in the proceedings. It is odd, at best, that
MAT Leasing is trying to benefit from more than six
months' delay in the resolution of this case, when much of
that delay resulted from its own requests for or acquies-

cence in more time. There is no evidence that MAT Leasing has suffered any prejudice, harassment, or injustice as a result of the delays. The company was afforded ample opportunity to be heard and never challenged the length of time involved until after filing this appeal. Following either the Illinois cases or common sense, there is no call to apply Rule 277(f) in the circumstances of this case.

Both state and federal courts construe Rule 277 liberally. We have not found examples of cases where a reviewing court found that a lower court's ruling was invalid as a result of Rule 277(f)'s operation. The text of the rule supports this interpretation. It says that despite the six-month limit, "[t]he court may . . . grant extensions beyond the 6 months, as justice may require." Nothing in the rule requires a party to seek or request an extension from the court in order to avoid termination. Rather, the rule allows *the court* to "grant extensions . . . as justice may require." MAT Leasing is simply incorrect to say that the "plain language" of Rule 277(f) requires the plaintiffs to seek an extension, and its attempt to graft such a requirement onto the rule is without merit.

Even under MAT Leasing's theory of the rule, it appears that the district court did enough to grant the kind of extension that the rule contemplates. In the Agreed Order entered on May 25, 2004, the court stated:

> The citations filed herein by Laborers, and any additional third party citations issued by Laborers shall remain in full force and effect pursuant to Supreme Court Rule 277(f), and any recoveries obtained therefrom shall be applied first to the indebtedness due to MB and then to the indebtedness due Laborers.

This order expressly referred to Rule 277(f), noting that the citations issued in this proceeding would continue to have full effect under that provision. This statement, combined with the court's written orders entering each continuance of the proceedings, probably satisfy the rule's condition that a judge may extend the proceedings beyond six months. We can detect no basis for finding, as MAT Leasing urges, that the district court had no authority to enter these orders. The district court had subject-matter jurisdiction under 28 U.S.C. § 1331, and it did not lose that power through anything associated with Illinois Supreme Court Rule 277(f). We therefore move on to MAT Leasing's arguments on the merits.

B

MAT Leasing's two remaining challenges both deal solely with the validity of the district court's factual findings, which we will reverse only for clear error. See *McMahon Food Corp. v. Burger Dairy Co.*, 103 F.3d 1307 (7th Cir. 1996). MAT Leasing first challenges the finding that it owed any money at all to PMI; should we reject that argument, its last resort is a challenge to the district court's calculation of the amount owed. We conclude that neither finding was clearly erroneous.

To support its position that it owed no money to PMI, MAT Leasing asserts implausibly that there is "no evidence" of any indebtedness from MAT Leasing to PMI; it also contends that the district court's orders are invalid because the existence of the debt is "substantially disputed." Contrary to the claim that there is no evidence

of any debt, the record reveals considerable evidence of the debt, including PMI's computer records and the testimony of PMI President Thomas Murray. Murray testified that according to PMI's records, MAT Leasing owed PMI a total of $236,007.40 for services rendered, which remained unpaid at the time of the September 2005 hearing. Murray also testified to the status of specific invoices, including Invoice 743, which reflected an additional $57,710 owed to PMI. The existence of the debt was established at the hearing by Murray's testimony and by invoices kept in the ordinary course of business and generated from PMI's computer records.

It is notable that MAT Leasing does not argue that PMI failed to render services to MAT Leasing for which money was owed. Instead, it contends that it had an arrangement with PMI that offset its obligations to pay PMI. Specifically, MAT Leasing argues that it applied receivables that it owed PMI to PMI's balance with M.T. Transit, the trucking company. MAT Leasing's claim is that its use of funds owed to PMI to pay off PMI's other debts effectively cancelled out the amount that MAT Leasing otherwise would have owed. But MAT Leasing's only evidence of any such arrangement with PMI is Tadin's testimony at the hearing regarding his series of "handshake agreements" with Haughey. As we noted earlier, Tadin conceded that those agreements were verbal only, that no written documents exist to explain or support them, and that even he could not recall the details of them. The district court weighed the evidence before it and concluded that there was "no credible evidence that PMI agreed to any reduction of the value [of its] invoices," nor

was there any evidence to support MAT Leasing's claim that it was entitled to offset its indebtedness to PMI by transferring monies to M.T. Transit. It was well within the district court's discretion to accord minimal weight to Tadin's testimony, particularly where MAT Leasing had ample opportunity to call Joseph Haughey—the person purportedly on the other end of these handshake deals—to testify about the alleged adjustments in payment that underlie MAT Leasing's claim, but it declined to do so.

We add that to the extent MAT Leasing argues, on the basis of language in 735 ILCS 5/2-1402 (the Illinois statute that governs post-judgment proceedings) that we should invalidate the district court's orders because the debt's existence was "substantially disputed," the appellees correctly point out that the parts of the statute that apply to third-party respondents like MAT Leasing (as opposed to judgment debtors such as PMI) do not even mention the notion of a "substantial dispute." Compare 735 ILCS 5/2-1402(c)(1), pertaining to the judgment debtor and implicating the idea of an obligation that "is not substantially disputed," with § 1402(c)(3) and (c)(4), pertaining to parties other than the judgment debtor and containing no such language, instead authorizing courts to "[c]ompel any person cited, other than the judgment debtor, to deliver up any assets so discovered" during a post-judgment collection proceeding ((c)(3)), and to "[e]nter any order upon or judgment against the person cited that could be entered in any garnishment proceeding" ((c)(4)).

All of this leads to the conclusion that the argument that MAT Leasing raises based on a "substantial dispute"

over the amount owed is irrelevant. As the appellees point out, the very purpose of the evidentiary hearing was to resolve the question whether MAT Leasing owed money to PMI and, if so, how much. MAT Leasing did not oppose the hearing, and the district court conducted the proceeding just as it should have: it accepted and weighed the evidence offered by both parties, made credibility judgments where necessary, and made factual findings based on the evidence and the record before it. We cannot conclude that the district court clearly erred in finding that MAT Leasing owed a debt to PMI.

In its final attempt to undermine the district court's decision, MAT Leasing argues that even if it did owe money to PMI, the district court committed clear error in its calculation of the amount, which it placed at $242,647.75. The district court's calculation accounted for some of the credits and offsets that MAT Leasing advocated, but MAT Leasing contends on appeal that there are six categories of additional credits that the district court should have applied to further reduce the amount of the debt. We have reviewed the parties' briefs, the record, and the district court's thorough explanation of how and why it calculated the amount that MAT Leasing's owed, and we are satisfied that the court did not clearly err in reaching its findings. Indeed, it appears to us that the "credits" MAT Leasing now urges us to apply are either utterly irrelevant to the debt owed from MAT Leasing to PMI (*e.g.*, checks Tadin paid to Haughey for PMI but that Haughey took for his personal use; and the turnover order for assets of another company, Pacific Construction), or there is, as the district court found,

insufficient evidence in the record to support them (*e.g.,* the offsets for oral agreements that Tadin says he made with Haughey).

*   *   *

The judgment of the district court is AFFIRMED.