GARLAND, Circuit Judge,
concurring in the judgment:
The Terrorism Risk Insurance Act (TRIA) authorizes the attachment of “blocked assets” of state sponsors of terrorism to satisfy judgments won by victims of terrorist acts. TRIA § 201(a). Section 201(d) of TRIA provides that attachable blocked assets do not include former diplomatic property that “is being used exclusively for diplomatic or consular purposes.” Id. § 201 (d) (2) (B) (ii). I agree with my colleagues that property the State Department leases to another foreign mission is immune from attachment because it is property that is being used exclusively for diplomatic purposes. But I cannot agree that property the Department leases to a private party — which that party then uses for its own private purposes — is property that is being used exclusively for diplomatic purposes.
I concede that congressional drafting has not made our task easy. The difficulty arises because the section is written in the passive voice — referring to property that “is being used exclusively” — which leaves unanswered the question: being used by whom? My colleagues conclude that the section refers solely to use by the United States. They therefore hold that the tenant’s use of the property is irrelevant as long as the State Department’s only purpose in renting it is to generate revenue to comply with its Vienna Convention obligations.
This reading is reasonable, but I do not think it is the better interpretation. No one would say that property a tenant uses as a gin joint is being used exclusively for educational purposes, even if the landlord uses the rent to send his children to college. Nor is the court’s reading supported by the fact that TRIA applies only to property “seized or frozen by the United States.” TRIA § 201(d)(2)(A) (emphasis added). The italicized phrase tells us which actor’s seizure is relevant, but it does not tell us which actor’s use is. Indeed, the fact that Congress added “by the United States” to the description of the *25 seizure of property in § 201(d)(2)(A), but not to the description of the use of property in § 201(d)(2)(B), suggests it thought that the uses to which both the United States and its tenant put a property were relevant.
This inference is further supported by the waiver provision of TRIA, which authorizes the President to prevent the attachment of blocked assets on a case-by-case basis, unless the property “has been used by the United States for any nondiplomatic purpose.” Id. § 201(b)(2)(A) (emphasis added). As is clear from that provision, Congress plainly knew how to specify use by the United States when that was the use it regarded as relevant. And “where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.” Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (internal quotation marks omitted).
A final problem with the court’s reading is that it reduces Congress’ purpose to one of financial accounting, rather than to making assets available for the victims of terrorist attacks. That is the necessary consequence of focusing on how the United States uses the rent, rather than on how the tenant uses the property. In the court’s view, rental property remains immune as long as the State Department applies the rent to maintenance expenses, but it becomes available for attachment if the Department returns the rent to the Treasury and uses appropriated funds to pay for maintenance. Even if Congress were concerned about how the Department keeps its books, it is hard to see why it would address this concern in a section entitled, “Satisfaction of Judgments from Blocked Assets of Terrorists.” TRIA § 201.
For these reasons, I conclude that former diplomatic property that a private tenant uses for nondiplomatic purposes is not immune from attachment under TRIA § 201(d) as property that “is being used exclusively for diplomatic or consular purposes.” Id. § 201 (d) (2) (B) (ii).
But this conclusion does not end the analysis. The remaining question is whether the property at issue here “is being” used exclusively for diplomatic purposes. Although it is clear that some of the properties have been rented to private tenants and have been used by those tenants for nondiplomatic purposes, there is no record evidence that any property is being used for such purposes. The difference in tense is dispositive.
In protecting from attachment property that “is being used exclusively for diplomatic or consular purposes,” Congress expressly employed the present tense. TRIA § 201(d)(2)(B)(ii) (emphasis added). Where “Congress could have phrased its requirement in language that looked to the past ... but ... did not choose this readily available option,” the “most natural reading” is to construe the statute in the present (or present and future) tense. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 57, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); see Carr v. United States, — U.S. -, -, 130 S.Ct. 2229, 2236, 176 L.Ed.2d 1152, - (2010) (“By implication, ... the Dictionary Act instructs that the present tense generally does not include the past.” (referring to 1 U.S.C. § 1)). The inference that Congress’ choice of tense was intentional is even stronger where, as here, the legislature employed the present tense in one subsection and the past tense in another. Compare TRIA § 201(d)(2)(B)(ii) (excepting from attachment all specified prop *26 erty that “is being used exclusively for diplomatic ... purposes” (emphasis added)), with id. § 201(b)(2)(A) (authorizing the President to waive attachment on a case-by-case basis unless the property “has been used by the United States for any nondiplomatic purpose” (emphasis added)).
Given the statute’s use of the present tense, I would hold that TRIA § 201(d)’s protection against attachment applies to property that “is being used exclusively for diplomatic or consular purposes” at the time the writ of attachment is filed, regardless of how the property was previously used. This construction follows the course set by the Supreme Court in interpreting analogous statutory language. In Dole Food Co. v. Patrickson, for example, the Court construed the Foreign Sovereign Immunities Act, which requires an entity seeking to remove a lawsuit to federal court to show that “a majority of [its] shares ... is owned by a foreign state.” 538 U.S. 468, 473, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) (emphasis added) (quoting 28 U.S.C. § 1603(b)(2)). The Court held that “the plain text of this provision, because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed.” Id. at 478, 123 S.Ct. 1655 (emphasis added). Similarly, in Gwaltney v. Chesapeake Bay Foundation, the Court determined that the Clean Water Act’s authorization of citizen suits against defendants “alleged to be in violation ” of permit conditions “does not permit citizens suits for wholly past violations.” 484 U.S. at 64, 108 S.Ct. 376 (emphasis added). Rather, it requires that the defendant be alleged to “ ‘be in violation’ ... at the commencement of suit.” Id. (emphasis added) (quoting 33 U.S.C. § 1365(a)(1)).
In this case, the requirement that the property “is being used exclusively for diplomatic or consular purposes” is satisfied by the district court’s indication that, at the time the writs were issued, all of the properties were vacant and being held by the United States pursuant to its obligations under the Vienna Convention. See Bennett v. Islamic Republic of Iran, 604 F.Supp.2d 152, 164-65 (D.D.C.2009). Accordingly, I concur in my colleagues’ decision to affirm the quashing of the writs.
I note, however, that if the United States again rents these properties to private tenants who use them for nondiplomatic purposes, the plaintiffs should be free to attach them to satisfy their judgments. Although the government fears that permitting attachment under any circumstances “could have significant implications for U.S. foreign policy,” Appellee’s Br. 16, and my colleagues warn that attachment could interfere with the United States’ ability to fulfill its treaty obligations, the government can eliminate these concerns by ensuring that the properties are used exclusively for diplomatic purposes. If diplomatic tenants are unavailable, this may require the State Department to pay for maintenance from appropriated funds rather than rental income. But that presents at worst an economic, not a foreign policy problem. It is certainly a constraint that Congress is free to impose on the Department.