OCEAN LINE HOLDINGS
LIMITED, Plaintiff,

v.

CHINA NATIONAL CHARTERING
CORP., a/k/a Sinochart,
Defendant.

No. 07 Civ. 8123(DC).

United States District Court,
S.D. New York.

Sept. 26, 2008.

Freehill Hogan & Mahar LLP, by Peter J. Gutowski, Esq., Gina Venezia, Esq., New York, NY, for Plaintiff.

Lennon, Murphy & Lennon, LLC, by Patrick F. Lennon, Esq., New York, NY, for Defendant.

### MEMORANDUM DECISION

CHIN, District Judge.

In this admiralty case, I issued an order of attachment on September 20, 2007, authorizing the seizure of up to $177,520,838 of the assets of defendant China National Chartering Corp. a/k/a Sinochart ("Sinochart"). I authorized the attachment of such a high amount because of the nature of the damages alleged: the total loss of the M/V OCEAN VICTORY. Plaintiff Ocean Line Holdings Limited ("Ocean

Line"), the owner of the vessel, had chartered the OCEAN VICTORY to Sinochart, and while the vessel was trying to depart from the port of Kashima, Japan, it ran aground, broke in two, and sank. Sinochart disputes the claim, and, pursuant to the charter party, the merits will be contested in arbitration proceedings in London.

Sinochart makes three applications to the Court: (1) it moves to vacate the attachment on the grounds that under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* (the "FSIA"), it is immune from attachment as an instrumentality of the People's Republic of China (the "PRC"); (2) alternatively, it seeks counter-security for its claims for losses it sustained as a result of the casualty; and (3) it moves for an order requiring Ocean Line to post security for costs incurred in posting surety bonds.[1]

## DISCUSSION

### A. *Sinochart's Motion To Vacate*

#### 1. *Applicable Law*

The FSIA governs actions and proceedings in this country against foreign states and their agents and instrumentalities. *See Banco de Seguros del Estado v. Mut. Marine Office*, 344 F.3d 255, 260 (2d Cir. 2003) (FSIA sets forth "sole and exclusive" standards for resolving questions of sovereign immunity raised by foreign states in state and federal courts in United States). In general, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States," except as provided in the FSIA and subject to existing treaties. 28 U.S.C. § 1604; *see id.* §§ 1605–07.

The FSIA defines, in general, a "foreign state" as "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id.* § 1603(a). An "agency or instrumentality of a foreign state" is further defined to include:

any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e)of this title, nor created under the laws of any third country.

*Id.* § 1603(b).

Here, Ocean Line concedes that Sinochart meets the first and third prongs of the statutory definition of an "agency or instrumentality of a foreign state"; the only dispute is whether Sinochart meets the second prong, set out in § 1603(b)(2).

#### a. *FSIA § 1603(b)(2)*

The Supreme Court addressed the scope of § 1603(b)(2) in *Dole Food Co. v. Patrickson*, 538 U.S. 468, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003). In *Dole*, two Israeli companies sought instrumentality status under the FSIA. Israel did not directly own shares in either company. *See id.* at 473, 123 S.Ct. 1655. Instead, there were one or more tiers of corporate entities between the state and the subsidiary companies claiming immunity. *See id.* at 473–74, 123 S.Ct. 1655. The Supreme Court held that instrumentality status requires "direct ownership of a majority of shares

---

1. Ocean Line had also moved to expand the order of attachment to allow the seizure of funds that Ocean Line claims Sinochart is moving through this District under the names of other entities. This dispute was resolved.

by the foreign state" and thus, the companies were not instrumentalities of Israel under the FSIA. *Id.* at 474, 123 S.Ct. 1655. The Court rejected using the "colloquial" definition of ownership, noting that "[i]n issues of corporate law structure often matters." *Id.* at 474, 123 S.Ct. 1655. The Court also noted that Congress would have made clear if it intended anything other than formal ownership terms in the statutory language of the FSIA. *See id.* at 476, 123 S.Ct. 1655 ("Where Congress intends to refer to ownership in other than the formal sense, it knows how to do so.").

The language of § 1603(b)(2), specifically the phrase "other ownership interest," accounts for variances in ownership structure, including entities that do not issue shares. *See id.* at 476, 123 S.Ct. 1655 (explaining that FSIA "had to be written for the contingency of ownership forms in other countries, or even in this country, that depart from conventional corporate structures"). Thus, no matter the form of ownership, the foreign state must own a majority of the entity for the entity to be deemed an instrumentality.

An entity can also claim instrumentality status under the "organ" prong of § 1603(b)(2). Various factors are relevant to determine "organ" status under the FSIA, including:

(1) whether the foreign state created the entity for a national purpose;

(2) whether the foreign state actively supervises the entity;

(3) whether the foreign state requires the hiring of public employees and pays their salaries;

(4) whether the entity holds exclusive rights to some right in the [foreign] country; and

(5) how the entity is treated under foreign state law.

*Filler v. Hanvit Bank,* 378 F.3d 213, 217 (2d Cir.2004) (quoting *Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 846–47 (5th Cir.2000))(alteration in original). The *Filler* factors require a balancing but do not require particular emphasis on any factor or even that every factor be considered. *See Murphy v. Korea Asset Mgmt. Corp.,* 421 F.Supp.2d 627, 641 (S.D.N.Y. 2005).

### b. *The Burden of Proof*

■ On a motion to vacate a maritime attachment, the burden of proof rests on the party who sought the attachment to prove that it was proper. *See* Fed. R.Civ.P. Supp. R. E(4)(f). Here, however, the claim is one of immunity under the FSIA, which carries a separate set of burdens, and ultimately places the burden of proof on the party claiming immunity. *See Murphy,* 421 F.Supp.2d at 640–41. The party claiming immunity must first make a prima facie showing that it is an instrumentality of a foreign state. *See id.* at 640 (citing *Virtual Countries, Inc. v. Republic of South Africa,* 300 F.3d 230, 241 (2d Cir.2002)). The opposing party then "has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Cargill International S.A.v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir. 1993). Finally, the ultimate burden shifts back to the party claiming immunity to prove, by a preponderance of the evidence, that the entity is an instrumentality. *See Robinson v. Gov't of Malaysia,* 269 F.3d 133, 141 (2d Cir.2001) ("[A] district court must review the allegations in the complaint, the undisputed facts, if any, placed before it by the parties, and—if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue—resolve disputed issues of fact, with the defendant foreign sovereign shoulder-

ing the burden of persuasion."); *see also Cargill,* 991 F.2d at 1016.

### 2. *Application*

■ Here, the issue is whether defendant has proven that Sinochart is an instrumentality of the PRC entitled to immunity under the FSIA. Both plaintiff and defendant have submitted expert declarations on the formal ownership structure of Sinochart and its relationship to the PRC. I have taken into consideration the expert opinions and conclude that Sinochart is neither owned directly by the PRC nor an organ of the state, and, accordingly, is not an instrumentality of the PRC for these purposes.

Sinochart argues that it is 100% owned by the PRC because it is categorized under PRC law as an "enterprise owned by the whole people" ("EOWP"). (Wang Decl. ¶ 30). In making this argument, however, Sinochart fails to adhere to the Supreme Court's mandate—that an entity's instrumentality status be determined by its formal ownership structure. *See Dole Food Co. v. Patrickson,* 538 U.S. 468, 474, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) ("Congress intended statutory coverage to turn on formal corporate ownership."). Sinochart urges the Court to disregard the "factual contentions" put forth by Ocean Line detailing Sinochart's subsidiary relationship to Sinotrans, and instead accept that Sinochart, simply because it is labeled an EOWP, is owned by the state irrespective of its relationship to Sinotrans.[2] Ownership structure, not labels, must control the analysis. *See Edlow Int'l Co. v. Nuklearna Elektrarna Krsko,* 441 F.Supp. 827, 831 (D.D.C.1977) (rejecting the categoriza-

tion of all property under a socialist system as "state-owned" because it would require "every enterprise operated under a socialist system [to be deemed] an instrumentality of the state").

Despite Sinochart's label as an EOWP, I conclude that Sinochart is a subsidiary of Sinotrans, its parent entity. The evidence proving Sinochart's subsidiary status is overwhelming. Sinochart's Articles of Association state that Sinochart "is a subsidiary belonging to" Sinotrans. (Clarke Decl. ¶ 8; *see also* Chen Decl. ¶ 44 (Sinotrans describes Sinochart on its website as a subsidiary)). The Articles of Association detail that Sinochart's initial capital came from Sinotrans, profits not retained by Sinochart are to be remitted to Sinotrans, amendments to the Articles of Association must be approved by Sinotrans, and Sinochart's general manager and deputy general managers are appointed and removed by Sinotrans. (*See* Clarke Decl. ¶ 8; deLisle Decl. ¶ 45).

Under the FSIA and *Dole,* the central inquiry to determine instrumentality status is whether the PRC directly owns a majority of shares or other ownership interest in Sinochart. Here, Sinotrans, not the PRC, provided the entirety of the capital to create Sinochart. (*See* Chen Decl. ¶¶ 40–41; deLisle Decl. ¶¶ 91–92). Defendant argues that Sinochart was formed in 1955 directly by the PRC and with an initial capital contribution from the PRC. (*See* Second Song Decl. ¶ 6.4). Plaintiff does not dispute that an entity named Sinochart was established by the PRC in 1955. Instead, plaintiff's experts explain that, as with corporate entities in the Unit-

---

2. Defendant urges the Court to rely on *Trans Chemical Ltd. v. China National Machinery Import & Export Corp.,* 978 F.Supp. 266 (S.D.Tex.1997), in determining the ownership structure of an EOWP under PRC law. Although the court in *Trans Chemical* did evalu-

ate the ownership of an EOWP for reasons of FSIA immunity, it did not involve a subsidiary relationship, which is the central inquiry in the case at hand. Accordingly, it is inapplicable to this Court's analysis of the formal ownership structure of Sinochart.

ed States, Chinese entities undergo corporate restructuring. (*See* Second Clarke Decl. ¶ 21). Hence, defendant's argument is irrelevant, because instrumentality status is determined at the time suit is filed. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 478, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003). The expert declarations offered by both plaintiff and defendant describe the historical economic changes of the PRC that led to alterations in the corporate structure of Sinochart. (*See* Second Song Decl. ¶¶ 6.2–6.9; Chen Decl. ¶¶ 27–44). No matter the history, the Court must analyze the ownership structure of the present-day Sinochart. *See Dole*, 538 U.S. at 477, 123 S.Ct. 1655 ("The statutory language will not support a control test that mandates inquiry in every case into the past details of a foreign nation's relation to a corporate entity in which it does not own a majority of the shares."). It is clear from the declarations provided to the Court that present-day Sinochart is a distinct entity from that with the same name created in the 1950s. Sinochart, the entity at issue in this case, was created by Sinotrans in 1996. (*See* Clarke Decl. ¶ 24).

■ Furthermore, Sinochart's own expert does not refute the capitalization of Sinochart by Sinotrans. Instead, defendant's expert explains that Sinotrans provided the capital for Sinochart "acting on behalf [of] the Chinese Government". (Second Dihuang Decl. ¶ 9). This is precisely the framework rejected by the Supreme Court. To be deemed an instrumentality of the state, the investment must be directly from the state, not through a corporate intermediary, even if the intermediary is owned entirely by the state. *Dole*, 538 U.S. at 478, 123 S.Ct. 1655.

■ Defendant also argues that Sinochart is an instrumentality under the "organ" prong of 1603(b)(2). Defendant's reasoning, however, does not address any of the factors set out by the Second Circuit. *See Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir.2004) (holding Korean entity to be an organ because it was created by presidential decree, performs functions traditionally performed by government, its directors are appointed by Korean Ministry of Finance and Economy, and its president is appointed by President of Republic of Korea); *see also Murphy v. Korea Asset Mgmt. Corp.*, 421 F.Supp.2d 627, 642 (S.D.N.Y.2005) (entity deemed an organ because it was established to "rescue Korean financial institutions by purchasing and disposing of non-performing loans at prices in excess of what the loans would be worth on the open market").

Sinochart is not an instrumentality under the organ prong of § 1603(b)(2) because it was not formed to perform governmental functions, but rather to "engage[ ] in the shipping industry as agents, charterers, managers and operators of ocean going vessels and other functions related to the industry generally" (Xing Decl. ¶ 6)[3]; the top management of Sinochart is appointed by Sinotrans, not by the PRC; the employees are hired and fired by Sinotrans; and, Sinochart's employees are paid by Sinotrans. (*See* Second Chen Decl. ¶¶ 50–55). Lastly, Sinochart "enjoys no privilege in legal or administrative proceedings within China. It bears civil obligation and assumes civil liability as a private commercial entity does." (*Id.* ¶ 56).

---

**3.** Sinochart's Articles of Association and Business License describe its business purpose: "To accept instructions to charter in/out ships, to engage in ship sale and purchase and to arrange for ship repairs as the agent; to carry out ship operation and management and relevant cargo transportation, and to provide services in relation to international shipping information and consultation." (Second Chen Decl. ¶ 49).

■ Finally, defendant contends that Sinochart's property is protected from pre-judgment attachment under FSIA § 1609, which provides that "property in the United States of a foreign state shall be immune from attachment arrest and execution." 28 U.S.C. § 1609. Sinochart, in short, claims that it owns nothing because all of its assets are owned by the PRC. Defendant frames this as an alternative argument, but the conclusion turns entirely on Sinochart's instrumentality status. As has been discussed, Sinochart is not directly owned by the PRC and is therefore not an instrumentality. Accordingly, Sinochart's property is not directly owned by the PRC and is subject to attachment.

In sum, Sinochart is not immune from attachment under the FSIA because it is not an instrumentality of the PRC. Sinochart's true ownership structure reveals that it is a subsidiary of another entity, Sinotrans, and is not directly owned by the PRC. Furthermore, Sinochart is not an organ of the PRC as it was not created for a national purpose, is not actively managed by the PRC, and is treated under PRC law as a private commercial enterprise.

### B. *Sinochart's Motion for Counter-security*

■ Sinochart's alternative request, in the event the Court denies its motion to vacate, is for an order pursuant to Supplemental Rule E(7)(a) of the Federal Rules of Civil Procedure requiring Ocean Line to provide counter-security for the damages Sinochart is seeking by way of counterclaim.

Supplemental Rule E(7) governs security for a counterclaim. Subsection (a) provides:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the counterclaim unless the court, for cause shown, directs otherwise. Proceedings on the original claim must be stayed until the security is given, unless the court directs otherwise.

Fed.R.Civ.P. Supp. R. E(7)(a).

■ As the Second Circuit has made clear, Rule E(7) gives the trial court "broad discretion" to decide whether to order counter-security when the requirements of the Rule are met. *Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 399 (2d Cir.1995). The Rule is intended "to place the parties on an equality as regards security," but it is not intended to place such burdensome costs on plaintiffs as to prevent them from bringing suit. *Id.* at 399–400 (internal quotations omitted). The trial court may consider the merits of the counterclaim, but it "should do no more than screen out totally frivolous claims by the counterclaimant." *Front Carriers LTD. v. Transfield ER Cape Ltd.*, No. 07 Civ. 6333(RJS), 2007 WL 4115992, at *6 (S.D.N.Y. Nov.19, 2007) (internal quotations omitted); *accord Voyager Shipholding Corp. v. Hanjin Shipping Co.*, 539 F.Supp.2d 688, 691 (S.D.N.Y.2008) ("It is well established that counter-security will not be awarded for counterclaims that are blatantly without merit. . . .").

Here, Sinochart meets the requirements of Rule E(7)(a). It has given security. It has asserted a counterclaim alleging losses based on the same occurrence—the grounding and sinking of the M/V OCEAN VICTORY—that is the subject of the original claim, and alleges that Ocean Line breached the charter party. It seeks damages of $9,640,457.89, inclusive of interest, costs, and legal fees, as a result of the vessel's grounding and sinking. (Answ. &

Countercl. ¶ 16). The counterclaim is not "totally frivolous."

In opposing the request for counter-security, Ocean Line argues only that the request is "overstated" because certain aspects of the counterclaim are "unsustainable." (Pl. Sur–Reply Mem. at 21). Even assuming Ocean Line's arguments have merit, I cannot say that these aspects of the counterclaim are "blatantly without merit."

Accordingly, Sinochart's request for counter-security is granted and Ocean Line is ordered to post counter-security as set forth below.

### C. *Sinochart's Motion for Security for Costs*

■ Sinochart seeks additional security in the amount of $7,250,110.20 to cover its expenses in posting two surety bonds in the total amount of $177,520,838 as security for Ocean Line's claims in this case. (5/29/08 Letter from Def. Counsel to Court). As a result of its posting of the bonds, Sinochart obtained release of $26,145,153 in funds that had been restrained by the maritime attachment and garnishment process issued in this case. (6/12/08 Moore Decl. ¶ 40; Def. Mem. at 1–2). The bonds also obviated the need for any further attachments.

The $7,250,110.20 Sinochart seeks in additional security consists of some $5.3 million in bond costs (1% of the total amount of the bond for three years); $639,075 in interest on the bond costs; $1.1 million in bank charges for an undertaking to the bond company; and $137,722.50 in interest on the bank charges. (*Id.*). When Sinochart first moved for this additional security, it requested almost twice this amount, contending that the costs of obtaining the

bonds exceeded $13 million. (*See* 5/14/08 Lennon Decl. ¶ 16).

Supplemental Rule E(2)(b) provides:

[T]he court may ... require the plaintiff, defendant, claimant, or other party to give security, or additional security, in such sum as the court shall direct to pay all costs and expenses that shall be awarded against the party by any interlocutory order or by the final judgment, or on appeal by any appellate court.

Fed.R.Civ.P. Supp. R. E(2)(b).

In *Result Shipping,* the Second Circuit also addressed Rule E(2)(b) and held that here as well a trial court has "broad discretion" to order a party to post security for costs and expenses. Such costs may include "the premium for bonds obtained to release an attachment." 56 F.3d 394, 401 (2d Cir.1995). The concept is that the court may order a party to post security for costs that are "taxable as costs" in favor of a prevailing party; in connection with an attachment, security may be required for only "a very limited range of costs." *Id.* at 401–02.

Here, in the exercise of my discretion, I direct Ocean Line to post security for costs in the amount of $2 million. I decline to require security for interest on the bond premiums, bank charges, and interest on bank charges. At this juncture, I am not persuaded that these would be taxable costs. Moreover, Sinochart's initial request—for security in excess of $13 million—clearly was excessive. In addition, only some $26 million in funds had been attached, and Sinochart was not required to post $177 million worth of bonds to obtain release of the $26 million. While I understand that there was a risk to Sinochart that additional amounts might be attached, other arrangements could have been—and still can be—made to reduce the expense. I conclude that, under all the

circumstances, $2 million is a fair amount for additional security.

## *CONCLUSION*

For the foregoing reasons, Sinochart's motion to vacate the order of attachment is denied. Its alternative request for counter-security is granted, and Ocean Line is ordered, within ten business days hereof, to post counter-security in the amount of $9,640,457.89. Finally, Sinochart's request for additional security for costs is granted, to the extent that Ocean Line is also ordered, within ten business days hereof, to post security for costs in the amount of $2 million.