OPINION
{¶ 1} Plaintiff/Appellant Upper Valley Realty, Inc. (hereafter Appellant) appeals from the Miami County Court of Common Pleas decision to grant summary judgment to Defendants/Appellees Burnett Hanson and Lillie Pearl Hanson (hereafter Appellees) on claims one and three of Appellant's complaint. For the following reasons, we affirm.
 {¶ 2} On July 20, 2000 Appellant, through its agent Nathan Wright (hereafter Mr. Wright) and Appellees entered into an exclusive right to sell contract for Appellees' Tipp City residence. As part of the contract, Appellant agreed to be the exclusive listing agent for Appellees' property and Appellees agreed to pay Appellant a six percent commission on the gross selling price of the property. The listing arrangement was good for one year with a 60 day tail immediately after. This allowed for Appellant to receive the agreed commission not only if the property was sold within the one year contract period but also if Appellant made contact with a prospective buyer within the one year period who subsequently purchased the property within 60 days after the period expired.
 {¶ 3} In September 2001, after the contract period had expired, Appellees authorized Appellant to advertise the property for lease or purchase agreement. Soon thereafter, Wright was contacted by Rev. and Mrs. James Hughes (hereafter the Hugheses) who wished to lease the property and arrange for an option to purchase the property at a later date. Wright prepared a document titled Agreement to Lease and Purchase Real Estate, which set rent for the property at $1,500 per month for 18 months and provided the Hugheses with the option to purchase the property on or before March 10, 2003 for $345,000. Wright and the Hugheses signed the document but Appellees never signed the document. Appellant filled out the acceptance portion of the document noting that Appellees agreed to pay Appellant a $20,000 commission for selling the property. Appellant signed the document under the auspices of acting as Appellees' agent in this transaction.
 {¶ 4} Despite failing to sign the lease agreement, Appellees accepted the monthly rent payments from the Hugheses for 18 months. In March 2003, Appellees terminated Wright's services. The Hugheses did not attempt to exercise an option to purchase the property before March 10. In July 2003, the Hugheses reached an agreement to purchase the property from the Hansons for $325,000.
 {¶ 5} On April 7, 2004, Appellant filed a complaint against Appellees, alleging that Appellees' failure to pay Appellant a commission constituted breach of contract, fraud, and unjust enrichment. Both Mr. Hanson and Mr. Wright were deposed.
 {¶ 6} Dr. Hanson testified in his deposition that once the original contract with Upper Valley expired, "he planned to either dismiss him or find someone else to sell the property up until the time he called me and told me that Mr. Hughes wanted to buy the property." (Tr. 10). Hanson testified that Nathan Wright had Hanson's agreement to execute an agreement with Mr. Hughes to purchase the property in 4-6 months (after leasing it) with the stipulation if Hughes did not have the money to purchase the property he would have six months to do so. (Tr. 11).
 {¶ 7} Hanson testified that Wright sent him the lease/purchase agreement which provided that the Hugheses were renting the property for eighteen months after the Hugheses occupied the property but he did not sign it. (Tr. 15). Hanson acknowledged that he accepted the Hugheses lease payments for eighteen months. He didn't remember receiving the lease agreement (Ex. C) signed by the Hugheses, but recalled he held the Hugheses to their agreement in the lease to paying for repairs under $1,000. (Tr. 20). Hanson testified that if the Hugheses had purchased the property in four to six months from signing the lease/purchase agreement, he would have been agreeable with its provisions despite the fact he had not signed the contract. (Tr. 23). Hanson said he didn't evict the Hugheses because he didn't believe he had the right to do so. (Tr. 24). Hanson said he expressed his discontent to Wright but Wright was unresponsive. Hanson said he would have given Wright his commission "if he just sold the house." (Tr. 25). Hanson said he decided that "at the end of the 18 months him and Mr. Hughes would make a move and I would make a move and ensure that Mr. Wright did not work on my behalf anymore." (Tr. 26).
 {¶ 8} In his deposition, Nathan Wright admitted that he did not sell the property to the Hugheses under the terms of the original exclusive listing agreement. He testified that after the written contract expired, Dr. Hanson asked him to list his property for sale or lease. Wright testified that Reverend Hughes contacted him on September 1, 2002 and indicated he wanted to lease the Hansons' property with a right to purchase it in the future.
 {¶ 9} Wright said he prepared a written lease/purchase agreement for the Hugheses and Hansons' signatures, but only the Hugheses signed the agreement. The agreement provided for Wright and Upper Valley to receive a $20,000 commission but this likewise was not signed by the Hansons. (Def. Ex. 2). The agreement was signed by the Hugheses on September 11, 2001 and provided they had a right to purchase the Hansons' property no later than March 10, 2002.
 {¶ 10} The Hugheses did not purchase the Hansons' property by March 10, 2002 and Wright admitted that there was nothing in writing extending his exclusive right to sell the Hansons' property or to receive his $20,000 commission beyond that date. (Tr. 18).
 {¶ 11} Wright testified that he received an e-mail from Dr. Hanson on March 12, 2003. The e-mail read as follows:
 {¶ 12} "A. March 11, 2003. I talked to Mr. Hughes this weekend, and he wants a new lease for one year. There are two issues, and one of which that he does not want to do business with you. I have spent more than $80,000 trying to sell this house with you and received approximately $26,000 in rent. This does not include all my costs. I don't think I can afford to do business with you either. You did not sell the house. I don't know if and when he or someone else will purchase the property. I do not have an accountant to know that I cannot continue to lose this much money. Thank you for all you've done; however, I will find assistance elsewhere."
 {¶ 13} Wright agreed that he had been "discharged" by Dr. Hanson in March 2003. (Tr. 33). Wright testified that in the last two weeks of February and the first ten days of March 2003, Dr. Hanson called him four times. Wright said Dr. Hanson told him that he would extend the lease if the Hugheses needed more time but not for $1500 a month. Wright testified that Jennifer Hughes told him in early March 2003 that they had been approved for a loan but her husband was looking to negotiate a better deal with a different loan company. (Tr. 46). Wright testified that on the day the agreement was to close (March 10, 2003) Jennifer Hughes called him and asked him to ask Dr. Hanson for an extension. Wright said he called Dr. Hanson who agreed to an extension but not at $1500 a month. Wright said Mrs. Hughes wanted Dr. Hanson's phone number because she thought her husband could negotiate a better deal with Dr. Hanson. (Tr. 48). Wright said the next day he received Dr. Hanson's e-mail severing their relationship.
 {¶ 14} On November 5, 2004, Appellees filed a motion for summary judgment on counts one and four of the complaint. Appellees argued that there could be no breach of contract because the contract period had expired prior to Appellant's producing the Hugheses as prospective buyers. Moreover, Appellees asserted that they had not fraudulently denied Appellant a commission because Appellees had a right to refuse to execute the September 11, 2001 lease agreement due to the unacceptable terms
 {¶ 15} therein. Appellant filed a response, alleging that Appellees orally extended the listing period and, further, that Appellees assented to the terms of the September 11, 2001 lease agreement by accepting the rent payments from the Hugheses. The trial court granted summary judgment to Appellees on counts one and four. Thereafter, Appellant and Appellees reached an agreement as to counts two and three, which the trial court journalized to render the case final and appealable. Appellant filed a timely notice of appeal.
 {¶ 16} In granting summary judgment on the plaintiffs' breach of contract claim the trial court noted that the written listing expired in July 2001. The court found the evidence undisputed that the Hansons authorized the plaintiff to advertise the property for lease or purchase. The court also noted that the plaintiff arranged for the Hugheses to lease Appellees' property and to pay Appellant $50 a month as an administrative fee for collecting the rent. The court noted that the Hansons had denied agreeing to the terms of the lease/purchase agreement and noted that Appellees never signed the lease/purchase agreement. The trial court then noted as follows:
 {¶ 17} "Thus, whatever oral extension that could be inferred of the original listing agreement clearly did not survive the Defendant's termination of the Plaintiff in March 2003, or the expiration of the eighteen month lease. The closing of the property did not occur within sixty days of this termination and the Plaintiff, therefore, has no legal basis to claim a commission because of the sale of the property in August 2003.
 {¶ 18} "Therefore, without weighing the credibility of the testimony, the facts reflect that there was no breach of contract in this case, since there was no contract for a commission upon the sale of the property existing when Hughes closed on the property (August 2003).
 {¶ 19} "Accordingly, the Defendant's motion for summary judgment on the first cause of action is granted."
 {¶ 20} In granting summary judgment on the fraud claim, the trial court noted that Appellant was the experienced party in the transaction and that Appellant did not claim that Appellees ever promised to pay it $20,000 upon the sale of the real estate after the written agreement expired.
Standard of Review
 {¶ 21} Summary judgment is proper when 1) there exists no genuine issue of material fact to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence, being construed in the light most favorable to the nonmoving party, that reasonable minds could come to but one conclusion, one adverse to the nonmoving party.State ex rel. Parsons v. Fleming (1994), 68 Ohio St.3d 509,511, 628 N.E.2d 1377, 1379-1380. The party seeking summary judgment bears the burden of demonstrating that there is no genuine issue of material fact to be decided at trial. CelotexCorp. v. Catrett (1986), 477 U.S. 317, 330, 106 S.Ct. 2548,2556, 91 L.Ed.2d 265, 278; Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801-802. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-359, 604 N.E.2d 138, 140. However, the nonmoving party must not rely on mere allegations or their pleadings alone, but must set forth specific facts to demonstrate that trial issues exist. Chaney v. Clark Cty. Agricultural Soc.
(1993), 90 Ohio App.3d 421, 424, 629 N.E.2d 513, 515.
 {¶ 22} "First Assignment of Error: THE TRIAL COURT ERRED IN FINDING THAT THE 9/11/01 `AGREEMENT TO LEASE AND PURCHASE REAL ESTATE' WAS NOT A CONVEYANCE FOR PURPOSES OF APPELLANT'S ENTITLEMENT TO HIS COMMISSION."
 {¶ 23} A lease is a conveyance of estate in land such that a lease constitutes a sale of an interest in land if made with consideration. Brenner v. Spiegle (1927), 116 Ohio St. 631,157 N.E. 491. The Ohio Supreme Court has subsequently ruled in harmony with Brenner to hold that residential leases are conveyances rather than services administered by the landlord.Heritage Hills, Ltd. v. Deacon (1990), 49 Ohio St.3d 80, 82,551 N.E.2d 125.
 {¶ 24} Neither Appellant nor Appellees seem cognizant of the fact that the trial court decision granting summary judgment made no mention of the Brenner principle that a lease of real estate is a conveyance of land. Moreover, nothing in the decision indicates that the trial court treated the lease in this case as anything less than a conveyance of land. Therefore, Appellant's first assignment of error is overruled.
 {¶ 25} "Second Assignment of Error: THE COURT ERRED IN FAILING TO FIND THAT APPELLANT WAS THE PROCURING CAUSE OF THE SALE EVENTUALLY CONSUMMATED BETWEEN THE APPELLEE AND BUYER/TENANT."
 {¶ 26} Before a broker is entitled to a commission, he must show that he was the procuring cause of the sale. Bauman v.Worley (1957), 166 Ohio St. 471, 473, 143 N.E.2d 820. A procuring cause is a cause originating a series of events which, without break in continuity, result in accomplishment of the prime objective of employment of the broker, producing a ready, willing and able buyer on the owner's terms. Id. In order for a buyer to be considered ready, willing, and able, the buyer must be able to command the necessary funds to complete the transaction within the time required. Scott v. Cravaack (1977),53 Ohio App.2d 248, 251, 372 N.E.2d 1375. A broker is not entitled to recover a commission for the sale of real estate merely because he incurred expenses and/or spent time in an attempt to sell the property. Walker v. David Davies, Inc.
(1973), 34 Ohio App.2d 139, 144, 296 N.E.2d 691.
 {¶ 27} Appellant did not procure a ready, willing and able buyer for Appellee's real property. The terms of the contract specify that Appellant would be the exclusive listing agent for the property from July 2000 to July 2001. After the one year contract term expired, Appellant had a 60 day tail in which to close a sale with a buyer Appellant had shown the property during the contract period. Appellant did not show the property to the Hugheses until September 2001, after the contract had completed. Appellant could not have produced a ready, willing, and able buyer within the terms of the contract when the buyer was procured after the contract had expired.
 {¶ 28} The Hugheses contacted Appellant after Appellant listed the house for sale or lease as directed by Appellees because the house had not sold within the contract period. While this Court is less concerned with Appellees' change in the terms of the transaction (i.e. from strictly a sale to potentially a lease), it cannot be overlooked that both Mr. Wright's and Mr. Hanson's depositions indicate that the change in the listing was made only after the contract period had expired and onlybecause the contract period had expired without the arrangement resulting in a buyer for the property.
 {¶ 29} Likewise, Appellant cannot be said to have produced a ready, willing, and able buyer when the Hugheses expressed an inability to procure the necessary funds to purchase the house at the time they were introduced to Appellees in September 2001. The Hugheses did not command the funds necessary to complete the sale of the property until July 2003, two years after the contract for sale had expired. From March 2003 until July 2003, Appellees negotiated and worked with the Hugheses to complete the transaction without Appellant's assistance.
 {¶ 30} Appellant has urged this Court to apply the rule as stated in Legros v. Tarr that the procuring cause requirement is satisfied by the mere introduction of a potential buyer even if the negotiations are abandoned and later successfully resumed provided that the renewed negotiations stem from the original transaction. Legros v. Tarr (1989), 44 Ohio St.3d 1, 7,540 N.E.2d 257. However, Appellant failed to acknowledge that the transaction in Legros involved the services of a business finder rather than a real estate broker, whose functions the Ohio Supreme Court distinguished. Moreover, given not only the length of time from the expiration of the contract to the eventual purchase but the fact that Appellant was not involved in the final transaction, it cannot be said that the chain of events leading to the sale of the property had sufficient continuity to find that the eventual sale stemmed from the first introduction. Even viewing these circumstances in the light most favorable to Appellant, the trial court did not err when it found that Appellant had not produced a ready, willing, and able buyer as required in the original contract. As such, Appellant's second assignment of error is overruled.
 {¶ 31} "Third Assignment of Error: THE TRIAL COURT ERRED IN FAILING TO FIND THERE EXISTED AN IMPLIED CONTRACT BETWEEN THE PARTIES."
 {¶ 32} A broker may only recover a commission for sale of property by reason of a contract, either express or implied.Ostendorf-Morris Co. v. Slyman (1982), 6 Ohio App.3d 46,452 N.E.2d 1343. The broker has the burden to prove an employment contract existed between a broker and a homeowner.Ostendorf-Morris Co. v. Slyman (1982), 6 Ohio App.3d 46,452 N.E.2d 1343. Id. An implied contract is created when a seller authorizes the broker to produce a buyer under circumstances which should reasonably cause the seller to believe he will be expected to compensate the broker for the services. Id.
 {¶ 33} Appellant has, in essence, argued that the trial court erred by not finding that the unsigned lease and option to purchase contract should be treated as an implied contract between Appellant and Appellees because Appellees in fact exercised their part of the agreement and benefitted from the agreement. The undisputed facts presented by both parties does tend to support Appellant's contention that Appellant and Appellees had an implied in fact contract from September 2001 to March 2003.
 {¶ 34} Nevertheless, even if this Court gives force to the unsigned lease agreement Appellant drafted as an implied contract which Appellees ratified by their actions, such would not allow Appellant to recover a commission. That agreement specifies that the Hugheses would lease the property for 18 months (from September 11, 2001 to March 10, 2003) with the option to close a sale on the property prior to the conclusion of the lease period. However, the Hugheses did not close on the property on or before March 10, 2003; rather, Appellees and the Hugheses subsequently closed on the property in July 2003 without any additional aid from Appellant. It appears undisputed that Appellees took control over the sale of the property after the period of time covered by the unsigned contract and no longer made use of Appellant's services for that purpose. As such, Appellant has not specifically alleged, nor could Appellant reasonably argue, that there was an implied contract between Appellant and Appellees from March 2003 to July 2003. Therefore, Appellant's third assignment of error is overruled.
 {¶ 35} Based on the foregoing, the trial court's grant of summary judgment in favor of Appellee is AFFIRMED.
Wolff, J. And Fain, J., concur.