[Cite as *Acquisition Servs., Inc. v. Zeller*, 2013-Ohio-3455.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

ACQUISITION SERVICES, INC.

     Plaintiff-Appellant

v.

JAMES M. ZELLER, ET AL.

     Defendants-Appellees

Appellate Case No.    25486

Trial Court Case No.   2011-CV-7640

(Civil Appeal from
 Common Pleas Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of August, 2013.

. . . . . . . . . . .

STEPHEN E. KLEIN, Atty. Reg. No. 0014351, 240 Bohanan Drive, Vandalia, Ohio 45377
     Attorney for Plaintiff-Appellant

JOHN M. CLOUD, Atty. Reg. No. 0006262, 2160 Kettering Tower, Dayton, Ohio 45423, KELLY A.
BENNINGTON, Atty. Reg No. 0082277, JOSEPH C. LUCAS, Atty. Reg. No. 0081336, JOHN R.
GLANKLER, Atty. Reg. No. 0089941, 7015 Corporate Way, Suite 200, Centerville, Ohio 45459
     Attorneys for Defendants-Appellees

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1}     Plaintiff-Appellant, Acquisition Services, Inc. (Acquisition), appeals from a judgment of the trial court dismissing Acquisition's action against Defendants-Appellees, James Zeller and William Smith.   Acquisition contends that the trial court erred as a matter of law in dismissing the action, because Acquisition procured an offer from a ready, willing, and able buyer for the Defendants' business, and the Defendants entered into a purchase contract with the buyer on terms similar to the buyer's original offer.

{¶ 2}     We conclude that the trial court did not err in rendering judgment in favor of Zeller and Smith, because there are no issues of material fact regarding their liability on any legal theories that Acquisition presented to the trial court.   Accordingly, the judgment of the trial court will be affirmed.


I.   Facts and Course of Proceedings

{¶ 3}     James Zeller and William Smith have been partners for a number of years in various limited liability companies, including, among others, BJ Building Co., LCC, Griffin Cards, LLC, and Three Sisters, LLC.   One of their companies, BJ Building, owned an interest in a building that housed a Hallmark store located at 2100 East Dorothy Lane, Kettering, Ohio.

{¶ 4}     When the lease on the Hallmark store ended, Zeller and Smith formed Griffin Cards, LLC (Griffin), for the purpose of purchasing the Hallmark business. They did so because the landlord did not want a vacant space in the building.   Zeller and Smith lacked experience in selling greeting cards, and enlisted Cory Morris, the former manager of the Hallmark store, to assist them.   They gave Morris a 10% share in Griffin and kept 45% each.   Griffin was registered with the Secretary of State as an LLC in March 2006.

**{¶ 5}** In order to finance the purchase of inventory, Griffin took out a loan of $160,000 from Liberty Savings Bank (Liberty). Zeller and Smith signed for the loan as owners of Griffin, and also personally guaranteed the loan. In June 2006, Liberty filed a UCC Financing Statement with the Secretary of State, securing its loan to Griffin.

**{¶ 6}** Griffin incurred other debts, including an open account with Hallmark, which was used to purchase cards. A loan was also taken out in 2006 or 2007 with Park Security National Bank (Park), for about $200,000. Zeller and Smith personally guaranteed these debts as well.

**{¶ 7}** By the end of 2008, the business was nearing break-even or was slightly profitable. During 2008, the lease was renewed, and was scheduled to run through 2012. However, the store was carrying too much inventory, and by 2009, the business was losing money. Griffin also owed a substantial obligation to Hallmark. As a result, Griffin began to look for people who might know others with retail experience. One of these people was Kenneth Hattan, who owned Acquisition, a company that offered brokerage services to people seeking buyers for their businesses.

**{¶ 8}** In May 2009, Griffin and Acquisition signed an "Exclusive Agency Contract," which provided, in pertinent part, as follows:

> 1.    The UNDERSIGNED hereby agrees to sell through Acquisition Services, Inc., hereinafter referred to as AGENT, as sole and exclusive agent, the business described below, at a price of Six Hundred and Fifty Thousand Dollars $_650,000_ including all inventory, fixtures, franchise rights, lease assignment, equipment, name, goodwill, and no liability assumptions of the business known as

Griffin's Hallmark Shop, in Kettering, Ohio (Business).

2. Terms of sale will be an asset sale free and clear of all debts.

3. The UNDERSIGNED hereby authorizes AGENT to secure a purchaser for the above described business, and to accept a deposit thereon. The UNDERSIGNED agrees to pay AGENT a fee of 6% of the total consideration received for the business. The Fees shall be earned whether the business is sold, exchanged, consolidated, merged, or [sic] purchase of corporate stock in whole or part. As contemplated herein, the transaction is to be structured as an asset sale; however, in the event Sellers and Buyers decide to proceed with a stock sale, exchange, consolidation, or merger, then the fees shall be calculated as if the sale were an asset sale.

4. In consideration of AGENT'S effort to find a purchaser, it is agreed that AGENT shall have "The Sole and Exclusive Right to Sell" said business until December 31, 2009. It is further agreed that AGENT shall be entitled to the commission if the business is sold during the existence of this contract by AGENT or the UNDERSIGNED*[1] or by any other person at any price acceptable to the UNDERSIGNED. AGENT shall also be entitled to the commission if the business is sold within (12) months following the expiration date hereof, or any extension, to any person, persons, or corporation (or anyone acting in behalf of such purchaser) with whom AGENT has had contact relative to the sale of said

---

[1]A provision was added at this point, indicating that if the "Undersigned" (Griffin) created the buyer, the commission would be 3%.

business during the term of this contract. THE UNDERSIGNED agrees to refer promptly to ASI all contacts including the name, address and telephone number by potential buyers received during the term of this exclusive Agency contract. Such potential buyers shall be included among the contacts for which AGENT shall be entitled to receive a 3% commission in the event of sale within (12) months following of this contract. It is further agreed that AGENT shall be entitled to a commission if an arrangement is made between Seller and a third party intended to lead to a sale but not amounting to a sale during the period of this agency agreement, e.g., an agreement involving employment and/or an option to purchase intended to take effect after the term of the listing agreement.

5. The UNDERSIGNED acknowledges receipt of a copy of this agreement and certifies he is the Owner of said business or the duly authorized agent of the Owner, and that the business is under the management and control of the UNDERSIGNED. Said business will be made available to AGENT for showing at all reasonable times by AGENT, its associates and cooperating agents. Available data, records, and documents relating to the business will be shown or furnished to AGENT upon request. The UNDERSIGNED agrees to commit no act that will tend to obstruct AGENT'S performance hereunder.

* * *

6. AGENT hereby accepts exclusive right-to-sell agency for said business on the terms stated above, and agrees to use discretion and diligence in effecting a sale.

Exhibit A attached to the Complaint. *See also*, Exhibit 1 attached to the Affidavit of Kenneth Hattan, which in turn is attached to Acquisition's Motion for Extension of Time, Doc. #16; and Exhibit B attached to the Affidavit of Kenneth Hattan, which in turn is attached to Acquisition's Memo Contra Defendants' Motion for Summary Judgment and Motion to Dismiss Complaint, Doc. #31.

{¶ 9} Zeller signed the agency agreement on behalf of Griffin, as a "member." Smith did not sign the agreement in any capacity. Hattan signed the agreement on behalf of Acquisition.[2]

{¶ 10} Hattan then attempted to find buyers for about six months. Two prospective buyers stopped negotiating after they contacted Hallmark and received discouraging comments. In October 2009, Hattan procured additional buyers – Timothy Kleptz and Timothy's wife, Michelle Kleptz – who expressed substantial interest in purchasing the business.

{¶ 11} Around November 3, 2009, Zeller and Hattan met with Mr. and Mrs. Kleptz. At that time, Hattan presented an offer from the Kleptzes. The offer included purchase of all the assets, except cash accounts or accounts receivables, and also included the secured and personally guaranteed liabilities of the business. The buyers offered a purchase price of $1.00, plus the assumption of the lines of credit and the assumption of the accounts payable that the seller had secured or personally guaranteed. In addition, the agreement noted that while a specific dollar amount of indebtedness had not yet been determined, the buyer intended to commit to the assumption of $500,000 worth of liabilities in completing the transaction. Doc. #

---

[2] We have referenced the location of the contract documents in some detail, because the trial court incorrectly found a lack of evidence that Hattan had signed the agency agreement. Hattan did, in fact, present evidence that he signed the agreement. The court's error is harmless, however, because the court assumed for purposes of its discussion that Hattan had signed the contract.

31, Affidavit of Kenneth Hattan, ¶ 13, and Exhibit C attached to the Hattan Affidavit.[3]

{¶ 12}   According to Hattan, Zeller delayed accepting the agreement because he wanted to wait until after the busy holiday season when the business would be in a better cash position. Zeller also testified that the parties became considerably more serious about the sale once they got through the Christmas season, which was a very busy period.

{¶ 13}   After the November meeting, Griffin's attorney, Mr. Cloud, was contacted about setting up a limited liability corporation and creating documents to reflect a sale transaction.  Hattan testified that neither Zeller nor Smith communicated with him for months after the November meeting, despite his frequent attempts to reach them.  Zeller stated that discussions with Hattan occurred following the November meeting.  However, Zeller later indicated that he did not contact Hattan until after the sale was completed.  According to Zeller, Timothy Kleptz was Hattan's "client," and should have kept Hattan informed about what was going on.  Both Zeller and Smith were experienced in signing listing agreements and had attended numerous real estate closings prior to this transaction.

{¶ 14}   On January 15, 2010, articles of organization were filed for a limited liability company called Dorothy Lane Hallmark.  The owners were Zeller, Smith, and Mr. and Mrs. Kleptz.  The purpose of forming this entity was to move the Kleptzes into an organization that would give them participation as members.  By January 15, 2010, the parties had reached a meeting of the minds with respect to the sale, which was ultimately consummated on February 15, 2010.  Three Sisters Cards, LLC (Three Sisters), was subsequently substituted for Dorothy

---

[3] Zeller testified in his deposition that the purchase contract did not seem familiar and that he did not recall the buyers making an offer at the meeting.   Thus, the facts testified to by Hattan about the purchase agreement are disputed.

Lane Hallmark, because the latter name was not acceptable.

{¶ 15}   Before the sale was consummated, BJ Properties filed a UCC Filing Statement with the Secretary of State, asserting a security interest in the goods and assets of Griffin in the amount of $200,000.   According to Zeller, BJ had borrowed money from Park in early or mid-2007, and had loaned the money to Griffin.   The security interest was filed in order to protect this interest.

{¶ 16}   The security agreement between BJ and Griffin is undated and bears the signatures of both Zeller and Smith.   The UCC Filing Statement bears a date of January 25, 2010, and indicates that the filing type is an "original transaction."   Zeller Deposition, Doc. #34, Plaintiff's Exhibit 15, p. 1.   No other creditors had filed security interests at this point, other than Liberty.

{¶ 17}   As was noted, Griffin and Three Sisters signed the sales agreement on February 15, 2010.   The listed purchase price for the assets of Griffin was $532,592, which represented the approximate current aggregate balance due to three secured creditors:   Liberty ($149,451.93); BJ Building ($200,000); and Hallmark ($183,040).   The purchasers were not paying any monetary consideration, but were assuming the secured indebtedness owed to these three parties.   The purchasers did not assume any other liabilities of Griffin.   Doc. #34, Plaintiff's Exhibit 17, pp. 1-2.   The sales agreement was signed by Zeller on behalf of Griffin and by Timothy Kleptz on behalf of Three Sisters.   Hattan was not notified of the closing and did not attend.   No commission amount was allocated in the closing documents.   Zeller's position was that Acquisition had not earned a commission because they expected Acquisition to bring them a client who would eventually be capable of taking over the liabilities, including the

personal obligations of Zeller and Smith. However, this had not happened.

{¶ 18} About two weeks before Easter 2010, Hattan visited the Hallmark store and discovered Kleptz there. Kleptz told Hattan that he had taken over the business. After learning this information, Hattan tried to contact Zeller and Smith, but was unsuccessful for about two months. According to Hattan, Zeller told him at this point that Kleptz had not bought the business from them, but was only managing it.

{¶ 19} In early February 2011, Zeller sent Hattan the following e-mail, stating that:

It was our intent to get Tim and Michelle to make this profitable, assume the debt and remove us from the transaction. He had no money for this transaction. If he was successful in making it profitable he could take control of the company. The company lost more money last year than it did in 2009. I had to put up funds in July for Hallmark so Tim could get more cards delivered. He had not put any money in it. Now one of the lenders has called their note and Tim has no interest in paying it. We have to find a new lender and Tim is not interested in being obligated by that transaction. Could they make this profitable in 2011 maybe, but only if more capital is put in by someone else to take care of last year's losses. If Tim would be successful in putting us out of the business, there would be a commission due. So far that has not happened. Zeller Deposition, Doc. #34, Plaintiff's Exhibit 18.

{¶ 20} By early February 2011, however, it was clear to Zeller that Kleptz could not turn the business around. Shortly thereafter, in early March 2011, the members of Three Sisters signed a membership interest redemption agreement, pursuant to which the Kleptzes sold their

membership interests back to Three Sisters, and all parties released any claims against each other.

By July 2011, Griffin's attorney, John Cloud, was notifying unsecured creditors that Griffin had been out of business since February 15, 2010, and had no assets or funds available to satisfy claims.

{¶ 21} Acquisition filed suit against Zeller and Smith in October 2011, alleging breach of contract, unjust enrichment, and that Acquisition was the procuring cause that produced a purchaser ready, willing, and able to buy the business assets of Griffin. Acquisition, therefore, demanded $42,600 for the commission that was due. In response, Zeller filed a motion to dismiss, and Smith filed a motion for summary judgment. The trial court granted both motions, and dismissed the action.

{¶ 22} Acquisition appeals from the judgment of the trial court.

## II. Did the Trial Court Err in Dismissing the Action?

{¶ 23} Acquisition's sole assignment of error states that:

The Trial Court Erred as a Matter of Law by Dismissing This Action on the Basis That Defendant-Appellees Did Not Have to Pay for the Benefits They Received.

{¶ 24} Under this assignment of error, Acquisition contends that it is entitled to a commission for the sale based on principles of equity. In this regard, Acquisition focuses on the concepts of "procuring cause" and unjust enrichment. The issue is whether the trial court erred in granting both summary judgment and the motion to dismiss on these claims.

{¶ 25} "A trial court may grant a moving party summary judgment pursuant to Civ. R.

56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." (Citation omitted.) *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999). "We review summary judgment decisions de novo, which means that we apply the same standards as the trial court." (Citations omitted.) *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.)

{¶ 26} Orders granting Civ. R. 12(B)(6) motions to dismiss are also reviewed under a de novo standard of review. (Citation omitted.) *Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44, ¶ 5. In conducting this review, courts traditionally "accept as true all factual allegations in the complaint." *Id.*, citing *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). "Then, before [the complaint may be dismissed], it must appear beyond doubt that plaintiff can prove no set of facts warranting a recovery." *Mitchell* at 192, citing *O'Brien v. Univ. Community Tenants Union*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975), syllabus.

{¶ 27} As was noted, Acquisition presented three claims in its complaint – breach of contract, unjust enrichment, and "procuring cause." The trial court concluded that both Smith and Zeller were entitled to judgment in their favor on the breach of contract claim. In this regard, the court reasoned that Zeller clearly signed the exclusive agency agreement on behalf of Griffin, and not in his individual capacity. In addition, Smith did not sign the agreement in any capacity. Thus, the court concluded that Griffin was the proper party to the breach of contract

claim, not Zeller and Smith. Acquisition has not challenged this holding on appeal.

{¶ 28} Concerning the claim for unjust enrichment, the trial court concluded that the agency agreement contemplated a transaction in which Griffin would obtain cash to pay off its creditors, thereby releasing the personal guarantees of Zeller and Smith. In this regard, the court relied on paragraph one of the agreement, which contemplated a sale "at a price of Six Hundred and Fifty Thousand Dollars $_650,000_ including all inventory, fixtures, franchise rights, lease assignment, equipment, name, goodwill, and no liability assumptions of the business * * *."

{¶ 29} Because Zeller and Smith did not realize any cash and were still liable on their personal guarantees, the trial court held that they had received no benefit. Applying the same reasoning, the trial court also held that Acquisition had failed to procure a sale meeting the terms of the agency agreement.

{¶ 30} Before addressing the unjust enrichment and procuring cause claims, we should note that the trial court considered matters outside the complaint with respect to the claims against Zeller. Zeller filed a motion to dismiss, which only permits consideration of matters alleged in the complaint. Zeller did file an affidavit in connection with his motion to dismiss, but if the court wished to consider the affidavit as well as other factual matters, it should have notified the parties and allowed them "reasonable opportunity to present all materials made pertinent to such a motion by Rule 56." Civ.R.12(B).

{¶ 31} We consider the court's error to be harmless, however, because the same claims were asserted against both Zeller and Smith, and Acquisition did submit factual materials opposing the motion for summary judgment that Smith filed. Accordingly, we will consider the factual matters in the trial court record to decide whether summary judgment was properly

granted on the unjust enrichment and procuring cause claims.

## A.   Unjust Enrichment

{¶ 32}   In order to establish unjust enrichment, a party must prove the following elements:

1) a benefit conferred by a plaintiff upon a defendant; 2) knowledge by the defendant of the benefit; and 3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Harco Industries, Inc. v. Elco Textron, Inc.*, 2d Dist. Montgomery No. 19698, 2003-Ohio-2397, ¶ 14, citing *Hubbard v. Dillingham*, 12th Dist. Butler No. CA2002-02-045, 2003-Ohio-1443, ¶ 25.   (Other citation omitted.)

{¶ 33}   The doctrine of unjust enrichment is "inapplicable if an express agreement existed concerning the services for which compensation is sought; the parameters of the agreement limit the parties' recovery, in the absence of bad faith, fraud or illegality."   *Pawlus v. Bartrug,* 109 Ohio App.3d 796, 800, 673 N.E.2d 188 (9th Dist.1996), citing  *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55, 544 N.E.2d 920 (1989).   In the case before us, an express agreement existed between Griffin and Acquisition regarding the services for which compensation is being sought.   Therefore, the doctrine of unjust enrichment would not apply and Acquisition's recovery would be limited by the parameters of the Exclusive Agency Contract.

{¶ 34}   Admittedly, Acquisition's claim for unjust enrichment is being brought against Zeller and Smith, with whom Acquisition did not have an express agreement.   However, Zeller

and Smith did not benefit from the sale, because it did not absolve them of their personal liability for Griffin's debts. The agreement of sale only assumed liability for Griffin's secured debts. If Three Sisters had become successful in running the business, and had been able to pay the debts, Zeller and Smith might have eventually realized a benefit. They did not receive a benefit as a result of the sale, however. Instead, they stood in the same position as they had before – of being personally liable for the debts of the business, whether those debts were in Griffin's name or in the name of Three Sisters. Furthermore, they reduced their share of the assets of the company by a substantial amount. After the sale, Mr. and Mrs. Kleptz each owned 17% of Three Sisters, and Zeller and Smith combined had a total of only 66% of the company, as opposed to the 90% share they had owned in Griffin. See Zeller deposition, Doc. #34, Ex. 19, p.1.

## B. Procuring Cause

{¶ 35} Acquisition also claims that it should have been paid a commission pursuant to the "procuring cause" doctrine. However, this is not a separate claim for relief. Instead, it is a condition precedent to recovery.

{¶ 36} For example, "[u]nder an exclusive agency agreement, the seller grants the broker the right to sell and obtain a commission to the exclusion of all other brokers, but the seller reserves the right to sell the property himself without incurring an obligation to pay the broker's commission." *DiSalle Real Estate Co. v. Howell*, 117 Ohio App.3d 113, 115, 690 N.E.2d 25 (3d Dist.1996), citing *Dohner v. Bailey*, 20 Ohio App.3d 181, 183, 485 N.E.2d 727, 730 (2d Dist.1984). " 'Thus, a condition precedent to the broker's entitlement to his commission

is that he be the procuring cause of the sale.' " *Id*. at 115-116, quoting *Dohner* at 183.

{¶ 37}　In contrast, "[a]n exclusive right to sell contract differs in that in addition to granting the broker the right to sell to the exclusion of all other brokers, the seller also gives the broker the right to sell for the period of the contract even to the exclusion of the seller himself. Thus, should the property be sold during the term of the agency, the broker would be entitled to his commission regardless of whether or not he was the procuring cause of the sale."　(Citation omitted.)　*Dohner* at 183.

{¶ 38}　In the case before us, the contract was entitled "exclusive agency contract," but that term is not dispositive, because the contract gave Acquisition an exclusive right to sell during the period that the contract was in effect.　Specifically, under the contract terms, Acquisition had the sole and exclusive right to sell the business from the time the contract began (May 6, 2009), until December 31, 2009.　The contract further provided that Acquisition was entitled to a commission if the business were sold during that time by Acquisition, Griffin, "or by any other person at any price acceptable to" Griffin.　*See, e.g.*, Exhibit A attached to the Complaint, paragraph four.　The only exception was that if Griffin created the buyer, Acquisition would have been entitled to a 3% commission rather than a 6% commission.　Thus, if the business had been sold during the contract term, Acquisition would not have needed to show that it was the "procuring cause" of the sale.

{¶ 39}　Because the sale took place after December 31, 2009, the issue then becomes whether Acquisition needed to be the "procuring cause," and whether the sale was consistent with the contractual terms.　The trial court concluded that Acquisition was not a "procuring cause" of the sale because the sale did not meet the terms of the agency agreement.　In this

regard, the trial court focused on paragraph one of the agreement, which contemplated a cash sale that involved no assumption of liabilities by the purchaser. The court noted that the actual sale involved only an assumption of liabilities, and "left Zeller and Smith as guarantors of those liabilities." Doc. #55, p. 7. However, the trial court failed to take paragraph four into consideration, which indicates that a commission is due so long as a sale is reached "at any price acceptable to" Griffin. At the least, this creates an ambiguity with respect to whether the sale met the terms of the agreement.

**{¶ 40}** Furthermore, Acquisition still did not need to show that it was the "procuring cause" of the sale. In addition to providing that the sale need only be on terms acceptable to Griffin, paragraph four of the agreement states that:

"AGENT shall also be entitled to the commission if the business is sold within (12) months following the expiration date hereof, or any extension, to any person, persons, or corporation (or anyone acting in behalf of such purchaser) with whom AGENT has had contact relative to the sale of said business during the term of this contract." Exhibit A, paragraph four.

**{¶ 41}** The agreement thus provides that the purchaser need only be a person or entity with whom the agent has had "contact." In contrast, "[a] procuring cause is a cause originating a series of events which, without break in continuity, result in accomplishment of the prime objective of employment of the broker, producing a ready, willing and able buyer on the owner's terms." *Upper Valley Realty, Inc. v. Hanson*, 2d Dist. Miami No. 2005-CA-5, 2006-Ohio-314, ¶ 26, citing *Bauman v. Worley*, 166 Ohio St. 471, 473, 143 N.E.2d 820 (1957). This is a more stringent requirement than the fact that the sale must be to a person the agent has contacted about

the sale during the term of the contract. The standard of "contacting" an individual about a sale is not difficult to meet.

{¶ 42} Accordingly, in contrast to the trial court, we conclude that, at a minimum, there are factual issues regarding whether Acquisition was entitled to a commission for the sale of the business. The entity that purchased the business (Three Sisters) was not contacted by Acquisition prior to December 31, 2009, but Acquisition had contacted two members of that entity about the sale.

{¶ 43} The existence of these factual disputes does not necessarily mean that the trial court erred in rendering summary judgment. Specifically, Griffin, a limited liability company, was the only party to the agency agreement. In this regard, R.C. 1705.48(B) provides that:

> Neither the members of the limited liability company nor any managers of the limited liability company are personally liable to satisfy any judgment, decree, or order of a court for, or are personally liable to satisfy in any other manner, a debt, obligation, or liability of the company solely by reason of being a member or manager of the limited liability company.

{¶ 44} Under R.C. 1705.48(B), Zeller and Smith would not be liable for Griffin's debts or obligations, and summary judgment would be proper, since Griffin was the only party to the agreement. Despite this fact, Acquisition contends that Zeller and Smith should be found liable for the debt. Although Acquisition's brief does not specifically discuss piercing the corporate veil, this is essentially what Acquisition is asking us to do.

{¶ 45} In *Huttenbauer Land Co., L.L.C. v. Harley Riley, Ltd.*, 1st Dist. Hamilton No. C-110842, 2012-Ohio-4585, the First District Court of Appeals noted that:

Members of a limited liability company may only be reached individually if the plaintiff demonstrates that the behavior of the members merits disregarding, or piercing, the entity's limited liability structure. What is referred to as the corporate veil may be pierced when:

"(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Id.* at ¶ 15, quoting *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Co. Inc.*, 67 Ohio St.3d 274, 275, 617 N.E.2d 1075 (1993), paragraph three of the syllabus.

**{¶ 46}** In *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, the Supreme Court of Ohio stressed that "piercing the corporate veil is the 'rare exception' that should only be 'applied in the case of fraud or certain other exceptional circumstances.' " *Id.* at ¶ 26, quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003). The court noted that the test adopted in *Belvedere* "struck the correct balance between the guiding principles of limited shareholder liability and the fact that shareholders occasionally misuse the corporate form as a shield from liability for their own misdeeds." *Id.*, citing *Belvedere* at 287, 289. The court went on to state that:

Limiting piercing to cases in which the shareholders used their complete control over the corporate form to commit specific egregious acts is key to

maintaining this balance. Were we to allow piercing every time a corporation under the complete control of a shareholder committed an unjust or inequitable act, virtually every close corporation could be pierced when sued, as nearly every lawsuit sets forth a form of unjust or inequitable action and close corporations are by definition controlled by an individual or small group of shareholders. (Citation omitted.) *Id.* at ¶ 27.

**{¶ 47}** In view of these concerns, the Supreme Court of Ohio decided to modify the second prong of *Belvedere*, stating that:

However, having reviewed the various tests for piercing the corporate veil developed by other authorities, we are convinced that our pronouncement in *Belvedere* is too limited to protect other potential parties from the wide variety of egregious shareholder misdeeds that may occur. Limiting piercing to cases of fraud or illegal acts protects the established principle of limited liability, but it insulates shareholders when they abuse the corporate form to commit acts that are as objectionable as fraud or illegality. In view of the reality that shareholders could seriously misuse the corporate form and evade personal liability under the second prong as presently worded, we find it necessary to modify the second prong of the *Belvedere* test to allow for piercing in the event that egregious wrongs are committed by shareholders.

Accordingly, we hold that to fulfill the second prong of the *Belvedere* test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit

fraud, an illegal act, or a similarly unlawful act. Courts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct. *Dombroski,* 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, at ¶ 28-¶ 29.

**{¶ 48}** As applied to the case before it, the Supreme Court of Ohio held that a claim of an insurer's bad faith was "a straightforward tort, a basic example of unjust conduct; it does not represent the type of exceptional wrong that piercing is designed to remedy." *Id.* at ¶ 30.

**{¶ 49}** In the present case, the complaint raised a claim of unjust enrichment, but did not mention fraud. The complaint also did not specifically refer to piercing the corporate veil. In fact, the issue of piercing the corporate veil was first mentioned in Zeller's Motion to Dismiss. *See* Motion to Dismiss Plaintiff's Complaint as Against Defendant James M. Zeller, Doc. #13, pp. 4-6. In responding to the motion to dismiss and to Smith's summary judgment, Acquisition contended that Griffin was merely the "alter ego" of Smith and Zeller, and that their misconduct justified piercing the corporate veil. Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment & Motion to Dismiss Complaint, Doc. #31, p. 18.

**{¶ 50}** The trial court's decision failed to address these points, which pertain to the contract signed by Griffin. Instead, the court dismissed the contract claim because Acquisition had sued the wrong party.

**{¶ 51}** Assuming for the sake of argument that Acquisition properly raised the issue of piercing the corporate veil, we conclude that there are no genuine issues of material fact pertaining to this issue. The facts set forth in the complaint and depositions indicate that there may be disputed issues of material fact concerning the second prong of the test, i.e., whether

Zeller and Smith exercised control in a manner as to commit fraud or an illegal act – although the actions alleged in the case before us appear to be more of the garden-variety unjust acts contemplated by the Supreme Court of Ohio with respect to closely held entities, not the type of egregious acts that are required to pierce the corporate veil. There may also be material issues of fact regarding whether Acquisition suffered injury as a result of the allegedly fraudulent or illegal acts.

{¶ 52} However, no evidence was presented that would raise material issues of fact on the first prong of the test, which requires that "control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own * * * ." *Huttenbauer Land Co., L.L.C.,* 1st Dist. Hamilton No. C-110842, 2012-Ohio-4585, at ¶ 15, citing *Belvedere*, 67 Ohio St.3d at 275, 617 N.E.2d 1075, paragraph three of the syllabus.

{¶ 53} In *Springfield v. Palco Invest. Co., Inc.*, 2013-Ohio-2348, ___ N.E.2d ___ (2d Dist.), we noted that:

> In determining whether a corporation is an individual's alter ego, Ohio appellate courts consider various factors, such as (1) whether corporate formalities were observed, (2) whether corporate records were kept, (3) whether corporate funds were commingled with personal funds, (4) whether corporate property was used for a personal purpose, and (5) gross undercapitalization. These factors are non-exclusive. See *State ex rel. DeWine v. S & R Recycling, Inc.*, 195 Ohio App.3d 744, 2011-Ohio-3371, 961 N.E.2d 1153, ¶ 31 (7th Dist.) (also considering whether shareholders held themselves out as personally liable for certain corporate obligations and used the corporation as a facade for the majority shareholders) * *

*.    (Citations omitted.)  *Id.* at ¶ 84.

**{¶ 54}**    Zeller's affidavit, filed in conjunction with the motion to dismiss, indicates that Griffin had operated as a for-profit limited liability company registered with the Secretary of State since 2006; that Griffin had maintained corporate records, minutes, and formalities; and that Griffin had filed separate partnership records with the Internal Revenue Service.  Zeller further indicated that he had never diverted funds or property of Griffin for his own personal use.  Despite having had an opportunity for discovery before responding to the pending motions, Acquisition presented no evidence disputing these facts.

**{¶ 55}**    Furthermore, although Zeller and Smith had personally guaranteed the business loans in 2006 in order to get the business up and running, no evidence was presented to indicate that Griffin was grossly undercapitalized.  After the loans were guaranteed, the business operated for a few years, was slightly profitable or was nearing break-even, and had renewed its lease in 2008 for several more years.  However, a downturn occurred in 2009, leading to the sale.

**{¶ 56}**    Again, no evidence was presented to indicate factual issues regarding whether the corporation was simply an alter ego, and Acquisition, therefore, failed to raise factual issues concerning whether the corporate veil should be pierced.

**{¶ 57}**    In its brief, Acquisition cites authority indicating that an agreement may be implied in law, based on principles of equity.  *See, e.g.*, *Legros v. Tarr,* 44 Ohio St.3d 1, 540 N.E.2d 257 (1989).  In *Legros*, a corporation retained a business finder to locate potential acquisitions.  After the contract with the business finder expired, a vice president of the corporation, Tarr, used the confidential information that had been disclosed, and set up a new

company, Burning Hills, which purchased the companies that had been previously identified. *Id*. at 2-4. As part of the transaction, Tarr received stock in Burning Hills and a substantial salary. *Id*. After learning of the transaction, the business finder filed suit against Tarr and Burning Hills to recover the commissions due under the original contract. *Id*. at 4.

**{¶ 58}** The trial court found that both Tarr and Burning Hills were liable for the commission, but the court of appeals reversed, concluding that an implied contract had not been established under the doctrine of quantum meruit. *Id*. at 5. The Supreme Court of Ohio then reversed the court of appeals, stating that:

> Although a party to an acquisition is ordinarily held to have no liability to a finder in the absence of a contract, express or implied in fact, to pay for such finder's services, an exception exists where the party or its agent misappropriates the finder's proprietary information and uses it to such party's benefit, in which case an agreement to pay may be implied in law and the finder can recover in *quantum meruit*. (Italics in original.) *Legros* at paragraph two of the syllabus.

**{¶ 59}** "Unjust enrichment and quantum meruit are doctrines 'derived from the natural law of equity' and share the same essential elements." *Meyer v. Chieffo*, 193 Ohio App.3d 51, 2011-Ohio-1670, 950 N.E.2d 1027 (10th Dist.2011), ¶ 37, quoting *Maghie & Savage, Inc. v. P.J. Dick, Inc*., 10th Dist. Franklin No. 08AP-487, 2009-Ohio-2164, ¶ 33.

**{¶ 60}** Under either theory, the party seeking recovery:

> must establish that (1) the plaintiff conferred a benefit on the defendant, (2) the defendant knew of the benefit, and (3) it would be unjust to permit the defendant to retain the benefit without payment. The doctrines differ with respect to the

calculation of damages – damages for unjust enrichment are "the amount the defendant benefited," while damages for quantum meruit are "the measure of the value of the plaintiff's services, less any damages suffered by the other party." (Citation omitted.) *Id.*, quoting *U.S. Health Practices, Inc. v. Byron Blake, M.D., Inc.*, 10th Dist. Franklin No. 00AP-1002, 2001 WL 277291, *2 (Mar. 22, 2001).

**{¶ 61}** We have previously concluded that there are no genuine issues of material fact regarding the unjust enrichment claim, because there is no evidence that Zeller and Smith derived any benefit from the sale. In fact, they were in a worse position than they were before the company sold. Specifically, before the sale, Zeller and Smith each owned 45% of Griffin and were personally liable for the debts of the business. No money was paid to Griffin as a result of the sale. After the sale, Zeller and Smith together owned only 66% of Three Sisters, while still being personally liable for the debts. As a result, Zeller and Smith derived no benefit and are not liable on a quantum meruit theory.

**{¶ 62}** Accordingly, even though the trial court erred in analyzing the exclusive agency contract terms, the trial court was correct in concluding that Acquisition cannot recover against Zeller and Smith for the commission that is allegedly owed.

**{¶ 63}** Based on the preceding discussion, Acquisition's sole assignment of error is overruled.

### III.  Conclusion

**{¶ 64}** Acquisition's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FAIN, P.J. and HALL, J., concur.

Copies mailed to:

Stephen E. Klein
John M. Cloud
Kelly A. Bennington
Joseph C. Lucas
John R. Glankler
Hon. Barbara P. Gorman